[No. 15750–7–I.   Division One.   February 18, 1986.]

WILLIAM MILLER, *Respondent*, v. THOMAS S. PETERSON, *Appellant.*

*Bassett & Morrison* and *Daniel F. Mullin,* for appellant.

*Levinson, Friedman, Vhugen, Duggan, Bland & Horowitz, Marsha Pechman,* and *Maria S. Diamond,* for respondent.

WEBSTER, J.—Dr. Thomas S. Peterson, podiatrist, appeals from the jury's verdict finding him liable for medical malpractice. Peterson argues 19 assignments of error including incorrect jury instructions, improper exclusion of witnesses and various evidentiary errors. We affirm.

### FACTS

On April 6, 1982, William Miller, now age 84, presented to Dr. Peterson, a podiatrist, with an infected bunion of the right foot. Miller related a past history of gout. Dr. Peterson debrided the infected area and applied an antibiotic powder. Miller returned to Peterson's office on April 13, 1982, and again on August 31, 1982. On the latter visit, Dr. Peterson discussed with Miller the possibility of surgery to improve the conditions caused by deformities of the right foot.

A consent form was signed by Miller and on September

28, 1982, Peterson performed surgery on Miller's right foot removing bone and cartilage and inserting a Swanson design implant in the big toe. During the surgery a white, milky substance was found which later proved to be "gouty" (uric acid) crystals.

In April 1983, Miller, complaining of pain in the right foot, was examined by Dr. Kent Saltonstall, an orthopedist. Dr. Saltonstall noted redness, a deformity in the big toe joint, and rotation of the big toe. When conservative measures failed to alleviate Miller's foot pain, Dr. Saltonstall suggested surgery to remove the implant, which surgery he performed.

On October 3, 1983, Miller filed a personal injury damages complaint against Dr. Peterson. Because of Miller's age the parties stipulated to an early trial date. At trial, Miller argued that Peterson: (1) failed to diagnose and treat gout; (2) should have treated Miller conservatively, without surgery; (3) improperly decided to insert an implant and remove portions of the second and third metatarsal bones of the right foot; and (4) failed to obtain Miller's informed consent. The jury returned a verdict in Miller's favor. Peterson appeals.

### EXCLUDING EXPERT TESTIMONY

Peterson argues that the trial court erred in striking expert witness testimony and in refusing to grant him a continuance.

On August 8, 1984, Peterson notified Miller's counsel that Dr. John Silver, an orthopedist licensed in California, would be called as an expert witness at trial. The trial date had been set for August 13, 1984. Due to the late date of discovery, Miller moved for an order striking Silver's testimony, and on August 10, a superior court judge entered an order granting Miller's motion and denying Peterson's motion for a continuance.

On August 9, 1984, Peterson notified Miller that Dr. Paul Brown, a rheumatologist, and Dr. Byron Hutchinson, a podiatrist, would be called as expert witnesses at trial. On

August 14, Miller moved to strike the testimony of these two experts. The trial judge struck the testimony of Dr. Brown and allowed Hutchinson to testify as a factual witness only.

■ In *Barci v. Intalco Aluminum Corp.*, 11 Wn. App. 342, 351, 522 P.2d 1159 (1974), this court held that a trial court should not exclude testimony unless there is a showing of intentional or tactical nondisclosure, willful violation of a court order, or other unconscionable conduct by the procurer of the testimony. In *Barci* we set forth the material factors which should guide the trial court in making a decision whether to exclude or allow testimony from a witness who was unobtainable and undisclosed either during trial or until just before trial. These factors are:

(a) the presence or absence of good faith attempts by the proponent of the witness to comply with the rules of discovery, (b) the availability or discoverability of the witness at an earlier time, (c) the circumstances of the proponent at the time of the securing of the witness, *i.e.*, whether a physical injury or illness had progressed to a point where diagnosis and/or prognosis was possible and/ or whether the passage of time had made the consequences of the acts of the parties discernible to an expert witness at an earlier time, (d) the materiality of the proposed testimony to the proponent, (e) the extent of surprise to the opponent, (f) the availability of opportunity to the opponent to depose the witness, (g) the availability of opportunity to the opponent to prepare for cross–examination, (h) the opportunity to the opponent to secure contradicting witnesses, (i) the prejudice presented to a proponent or opponent's case if a continuance is granted, (j) the impact upon both parties of the expenses of delay, and (k) the ability of an imposition of costs upon a proponent to remedy any hardship imposed upon an opponent by the late calling of a witness.

*Barci*, at 349–50.

Considering these factors as applied to the case sub judice we reach a result different from that in *Barci*. Although the record does not disclose a violation of a court order or any other unconscionable conduct on behalf of

Peterson, other factors weigh heavily in favor of excluding the testimony.

The most important factor in this case is the prejudice to Miller from a continuance. Miller had arranged for his experts to testify during the time period originally scheduled for the trial. Peterson stated that Dr. Silver was unavailable for trial until August 31. Unfortunately, if the trial were to be continued, both Dr. Saltonstall and Miller's counsel were unavailable until sometime in September. Additionally, Mr. Miller was nearly 83 years old at the time of trial. We note it was Mr. Miller's age which prompted the parties to stipulate to an early trial date in the first place. Thus, while in many instances a continuance is an appropriate remedy when one party springs a surprise witness, in this case it was not.

Other factors which weigh in favor of excluding the testimony are: (1) without a continuance Miller would have been unable to depose or prepare cross examination of either Brown or Hutchinson, concerning their expert testimony, until after a substantial portion of his case in chief was presented; (2) with respect to Hutchinson, Peterson offered no reason why Hutchinson could not have been identified earlier as an expert witness; (3) Miller is retired and living on a fixed income, thus an increase in expenses due to delay would have been a hardship; and (4) much of the testimony offered by Peterson's excluded experts was cumulative of testimony given by Peterson's remaining experts who did testify at trial. Weighing these factors, we find the trial court did not err in excluding the testimony.

Peterson argues that regardless of the court's initial decision to exclude his experts' testimony, the court should have permitted the experts to testify later to rebut new issues raised during trial. He contends that in Miller's case in chief two issues were raised for the first time, namely: (1) whether a base–wedge osteotomy is a mandatory component of a Swanson implant surgery; and (2) whether the presence of uric acid crystals in the joint constitutes an acute gout attack.

Peterson made offers of proof regarding the proffered testimony of Dr. Brown and Dr. Silver to rebut Dr. Saltonstall's testimony raising the alleged new issues. However, even assuming new issues were raised, Dr. Saltonstall's testimony did not stand uncontroverted. In addition to Peterson's own testimony, Dr. Lipon, Dr. Kravette, and Dr. Hutchinson testified concerning the propriety of Peterson's decision to conduct the implant surgery in light of the presence of uric acid crystals and his decision to remove portions of the metatarsal heads.

A trial judge may exclude relevant evidence on the basis that it is cumulative. ER 403. The proffered testimony of Silver and Brown contained basically the same opinions as those offered by the experts who testified at trial for Peterson. Thus, even if the trial court erred by excluding the testimony based on its original determination that the experts were disclosed too near the trial date, the error is harmless.

■ Peterson next alleges that the trial court had no discretion to limit cross examination of plaintiff's expert who testified concerning the reasonableness of the hospital charges. Peterson is mistaken. The scope of cross examination is within the broad discretion of the trial court and will not be overturned on appeal absent an abuse of discretion. *State v. Young,* 89 Wn.2d 613, 574 P.2d 1171, *cert. denied,* 439 U.S. 870 (1978). The trial judge ruled that the information Peterson attempted to elicit from the witness was irrelevant. The trial court should exclude irrelevant evidence. ER 402.

### EXCLUSION OF STATEMENT MADE BY PATIENT
### TO EXAMINING PHYSICIAN

■ Peterson contends that the trial court erred in excluding a statement made by Miller to Dr. Kravette in which Miller said "the orthopedist told [me] what was done to [my] foot was terrible and [I] should sue the doctor that did it." The trial judge ruled that the statement was not relevant. A trial court's determination of irrelevancy will

not be overturned on appeal absent an abuse of discretion. *Lee v. Sauvage,* 38 Wn. App. 699, 689 P.2d 404 (1984). The statement is not relevant to any issues presented at trial; thus, the statement was properly excluded.

### CROSS EXAMINATION BY USE OF LEARNED TREATISE

During cross examination of Miller's medical experts Peterson attempted to introduce various medical articles and manufacturer's pamphlets concerning the surgical procedure and the design of the implant. The court sustained Miller's objections that proper foundations had not been laid and excluded the evidence.

Under ER 803(a)(18) statements contained in published treatises and pamphlets on the subject of medicine, if established as authority, are made exceptions to the hearsay rule when used in cross or direct examination of an expert witness. The published works may be established as authoritative by the testimony or admission of the witness, by other expert testimony, or by judicial notice. ER 803(a)(18). However, when the text is used during cross examination, the burden of proving its authority is upon the cross examiner. *Dabroe v. Rhodes Co.,* 64 Wn.2d 431, 392 P.2d 317 (1964).

To the extent that the trial court assumed the *expert being examined* must find the text or treatise authoritative, it erred. However, we find any error to be harmless because Peterson failed to make an adequate offer of proof with respect to the excluded materials. ER 103(a)(2).

### STANDARD OF CARE OF PODIATRISTS

The issue of the proper standard of care for a podiatrist is one of first impression in Washington courts. RCW 4.24-.290 provides, in part:

In any civil action for damages based on professional negligence against . . . a podiatrist licensed under chapter 18.22 RCW, . . . the plaintiff in order to prevail shall be required to prove by a preponderance of the evidence that the defendant or defendants failed to exercise that

degree of skill, care, and learning possessed at that time by other persons in the same profession, and that as a proximate result of such failure the plaintiff suffered damages . . .

*See also* RCW 7.70.040.

■ At trial Miller offered, and the court accepted, a jury instruction on the standard of care which reads:

A doctor performing foot surgery and care owes to the patient a duty to comply with the standard of practice for the profession prevailing at the time of the care or treatment in question. This means that the doctor must possess and exercise the degree of skill, care and learning of a reasonably prudent doctor performing foot surgery and care in the State of Washington acting in the same or similar circumstances. Failure to exercise such skill, care and learning is negligence.

Instruction 8. Peterson excepted to the instruction arguing the instruction did not conform to the Washington Supreme Court's language in *Harris v. Groth,* 99 Wn.2d 438, 663 P.2d 113 (1983).

In *Harris v. Groth, supra,* a case involving alleged medical malpractice in the treatment of the plaintiff's eye, the court stated that the proper jury instruction should have been framed in the language of RCW 7.70.040(1) and RCW 4.24.290,

*i.e.,* whether a reasonably prudent ophthalmologist, possessing the degree of skill, care, and learning possessed by other ophthalmologists in the state of Washington, and acting in the same or similar circumstances as the defendant, would have performed an intraocular pressure test.

*Harris,* at 448. Peterson's proffered instruction substituted the words "podiatric surgeon" in place of the words "doctor performing foot surgery."

We find that the holding in *Harris* does not compel a reversal in the case at bar because the evidence does not disclose any perceivable difference between the standard of care of a podiatrist performing foot surgery and the standard of care of a medical doctor performing the surgery.

Usually the standard of care must be established by expert testimony. *Harris,* at 449. Three doctors, including one procured by the defendant, testified that the standard of care for a podiatrist performing foot surgery is or should be the same as the standard of care for an orthopedic surgeon performing foot surgery. There was no testimony that a special standard of care exists for a podiatrist who performs foot surgery. The instructions to be given in a particular case are governed by the facts proven in the case. *Harris,* at 447.

Nor do we find any prejudicial error resulting from the inclusion of the first sentence in the instruction, which is basically identical to the first sentence of former WPI 105.01. The court in *Harris* noted that "WPI 105.01 sets forth a proper form of a general reasonable prudence instruction which may also be given, if the first sentence is omitted." *Harris,* at 448 n.5.[1]

While we criticize the use of the first sentence in the instruction, the general rule is that a party who excepts to a court's instruction must provide the court with an instruction which correctly states the law and is otherwise properly formulated. *Harris,* at 447; *Brown v. Dahl,* 41 Wn. App. 565, 705 P.2d 781 (1985). Peterson's own proposed instruction uses the same "standard of practice" language that he objected to in the court's instruction. Moreover, since Peterson's proposed instruction was not a proper statement of the law with respect to the standard of care, it was properly rejected by the trial court.

---

[1]At the time of the court's decision in *Harris v. Groth,* 99 Wn.2d 438, 663 P.2d 113 (1983), WPI 105.01 provided:

"Negligence—General Health Care Provider

"A _____ owes to the patient a duty to comply with the standard of practice for the profession prevailing at the time of the care or treatment in question. This means that the _____ must possess and exercise the degree of skill, care and learning of a reasonably prudent _____ in the state of Washington acting in the same or similar circumstances. Failure to exercise such skill, care and learning is negligence."

## Testimony of Medical Experts on the Standard of Care

An issue closely related to the standard of care is the propriety of practitioners of one school of medicine (orthopedic surgeons) testifying against a practitioner of another school of medicine (podiatrist). The general rule is that a practitioner of one school of medicine is not competent to testify as an expert in a malpractice action against a practitioner of another school of medicine. *See* Annot., 85 A.L.R.2d 1022 (1962) and cases cited therein.

However, the courts have recognized exceptions to the general rule of incompetency in situations where, *inter alia*: (1) the methods of treatment in the defendant's school and the school of the witness are the same; (2) the method of treatment in the defendant's school and the school of the witness should be the same; or (3) the testimony of a witness is based on knowledge of the defendant's own school. 85 A.L.R.2d at 1026–28.

Several courts in other jurisdictions have addressed the precise issue of whether orthopedic doctors may testify regarding the standard of care to be observed by a podiatrist. In *Botehlo v. Bycura,* 282 S.C. 578, 320 S.E.2d 59, 64 (Ct. App. 1984), the court held that the standard of care in podiatry must be established by the testimony of one knowledgeable or skilled in podiatric practice. The court refused to allow an orthopedic surgeon to testify regarding the podiatric standard of care because he had no training in podiatry, was not familiar with podiatrists, and was not familiar with the surgical procedure performed by the podiatrist. *Botehlo,* 320 S.E.2d at 65.

In *Whitehurst v. Boehm,* 41 N.C. App. 670, 255 S.E.2d 761, 766 (1979), the orthopedic surgeon used by the plaintiff testified that he was not familiar with the standards of licensing or the standard of care for podiatrists. The court held that the standard of care could only be established by the testimony of another podiatrist or one equally familiar with that field of practice. *Whitehurst,* 255 S.E.2d at 767. On the other hand, when the orthopedic surgeons have

treated patients with the same ailment and are familiar with the procedure utilized by a defendant podiatrist, the orthopedic surgeons are competent to testify. *Sandford v. Howard,* 161 Ga. App. 495, 288 S.E.2d 739 (1982).

We hold that a practitioner of one school of medicine may testify against a practitioner of another school of medicine when the methods of treatment of the two schools are or should be the same. Whether an expert is qualified to testify is a determination within the discretion of the trial court and will not be reversed absent manifest abuse. *Harris,* at 450. We find no abuse of discretion.

### JURY INSTRUCTIONS

■ Peterson assigns error to jury instruction 5, concerning plaintiff's damages and to the trial court's failure to instruct the jury on: (1) after–acquired knowledge of the physician, defendant's proposed instruction 9; (2) differences of opinions between physicians concerning methods of treatment, defendant's proposed instruction 16; and (3) aggravation of any preexisting conditions, defendant's proposed instruction 22. Instructions given to the jury are sufficient if they permit each party to argue his theory of the case, are not misleading, and when read as a whole, properly inform the jury of the applicable law. *Tiderman v. Fleetwood Homes,* 102 Wn.2d 334, 684 P.2d 1302 (1984).

Defendant's proposed instruction 16[2] relates to the plaintiff's duty to establish, through expert testimony, the standard of care. *See Richison v. Nunn,* 57 Wn.2d 1, 16, 340 P.2d 793 (1959), *cert. denied,* 364 U.S. 816 (1960); *Adams v. Richland Clinic, Inc., P.S.,* 37 Wn. App. 650, 681 P.2d 1305 (1984). In *Adams* we stated that

[t]estimony reflecting only a personal opinion or testimony of experts that they would have followed a differ-

---

[2]Defendant's proposed instruction 16 reads:

"The testimony of other physicians that they were to follow a different course of treatment than that followed by the defendant, or a disagreement of doctors of equal skill and learning as to what the treatment should have been, does not establish negligence."

ent course of treatment than that of the defendant is insufficient to establish a standard of care against which a jury must measure a defendant's performance . . .

*Adams,* at 655. Since there was expert testimony on the standard of care and since the jury was given the standard of care in instruction 8,[3] we find no error.

Peterson contends that jury instruction 5[4] does not advise the jury that the plaintiff may be compensated only for injuries proximately caused by a defendant's negligence. He also argues that it was error for the court to refuse his proposed instruction 22[5] which would have informed the jury that any preexisting conditions not aggravated by the defendant's negligence are not to be considered in awarding damages. However, Peterson's concerns about these two instructions were sufficiently addressed in jury instruction 14;[6] therefore, we find no error.

---

[3]See text of instruction 8, at 829.

[4]Instruction 5 reads:

"Plaintiff is entitled to recover damages for the full extent of the injuries suffered by him as a result of the negligence, if any, of defendant even though the harm he suffered may have been greater due to the course of medical treatment he received thereafter, regardless of whether or not such treatment was done in a proper or a negligent manner."

[5]Defendant's proposed instruction 22 reads:

"If you find that before Dr. Peterson's surgeries of September 1982, the plaintiff had a pre-existing mental or bodily condition which was causing pain or disability, and further find that because of these surgeries the mental or physical condition or the pain or the disability was aggravated, then if your verdict is in favor of the plaintiff you should consider the aggravation of the condition or the pain or disability proximately due to such aggravation.

"But you should not consider any mental or physical condition or disability which may have existed prior to the surgeries performed by the defendant on the plaintiff or from which plaintiff may now be suffering which was not caused or contributed to by the reason of the surgeries performed by the defendant."

[6]Instruction 14 reads:

"It is the duty of the court to instruct you as to the measure of damages. By instructing you on damages, the court does not mean to suggest for which party your verdict should be rendered.

"If your verdict is for the plaintiff, you must first determine the amount of money required to reasonably and fairly compensate the plaintiff William Miller

Furthermore, we find no error in the trial court's rejection of defendant's proposed instruction 9.[7] This instruction basically rephrases the court's standard of care instruction, instruction 8. Peterson argues that Dr. Saltonstall, by relying on an article published in 1984 which recommended correction of any deformity before using an implant, improperly inferred that Dr. Peterson should have implemented such treatment in 1982. However, the court's standard of care instruction states that a doctor owes to a patient the duty to comply with the standard of practice prevailing at the time of the care or treatment in question.[8]

Lastly, Peterson argues that the cumulative effect of the trial court's errors denied him a fair trial. Having found no prejudicial error, we find this issue to be without merit.

---

[for] such damages as you find were proximately caused by the negligence of the defendant. You should consider the following elements:

"(1) The reasonable value of necessary hospital and medical care, treatment and services received.

"(2) The pain and suffering, both mental and physical, experenced [sic] and reasonably certain to be experienced in the future.

"(3) The disability and disfigurement experienced and reasonably certain to be experienced in the future.

"(4) The nature and extent of his injuries.

"The burden of proving damages rests with the plaintiff and it is for you to determine whether any particular element has been proved by a preponderance of the evidence.

"Your award must be based upon evidence and not upon speculation, guess or conjecture.

"The law has not furnished us with any fixed standards by which to measure pain, suffering, or disability. With reference to these matters you must be governed by your own judgment, by the evidence in the case, and by these instructions."

[7]Defendant's proposed instruction 9 reads:

"A physician is not to be judged in light of any after-acquired knowledge in relation to the case. The question of whether or not Dr. Peterson exercised reasonable care and skill as defined in these instructions, is to be determined by reference to what was known in relation to the case at the time of the treatment or care administered, and must be determined by reference to the pertinent facts then in existence of which he knew or in the exercise of ordinary care should have known."

[8]Instruction 8, *supra*.

Affirmed.

RINGOLD, A.C.J., and WILLIAMS, J., concur.

Reconsideration denied April 22, 1986.

Review denied by Supreme Court July 8, 1986.