[No. 24745-0-I.   Division One.   January 28, 1991.]

HELEN KETCHUM, ET AL, *Appellants,* v. OVERLAKE HOSPITAL MEDICAL CENTER, *Respondent.*

*Warren L. Dewar* and *Burns, Schneiderman & Dewar, P.S.,* for appellants.

*Mary McIntyre, Lee Barns,* and *Houger, Miller & Stein,* for respondent.

BRITT, J.*—Helen and Joseph Ketchum (referred to collectively as Ketchum), plaintiffs below, appeal from a judgment in favor of respondent Overlake Hospital Medical Center (Overlake) in a medical malpractice action. Among other things, Ketchum challenges an instruction informing the jury that a disagreement among health care providers regarding appropriate treatment does not establish negligence. We agree that the giving of the instruction was prejudicial error and reverse.

On September 28, 1980, appellant Helen Ketchum was admitted to respondent Overlake Hospital Medical Center. Ketchum's physician, Dr. John Maxwell, a neurosurgeon, had diagnosed a subarachnoid hemorrhage. An angiogram revealed that Ketchum was suffering from an aneurysm at the tip of her basilar artery, the primary artery supplying blood to the brain stem.

Ketchum suffered a second hemorrhage on October 6, 1980, which left her in a coma for several hours. Following this hemorrhage, Dr. Maxwell diagnosed vasospasm, a condition in which blood vessels constrict, reducing the blood

---

*Judge Dennis J. Britt is serving as a judge pro tempore of the Court of Appeals pursuant to RCW 2.06.150.

supply to the brain. Such constriction may be severe enough to destroy brain tissue supplied by the blood vessels.

On November 13, 1980, Dr. Maxwell operated on Ketchum. Utilizing a microscope, Dr. Maxwell placed a silver "clip" on the aneurysm to prevent future hemorrhage. The operation lasted from about 11 a.m. to 6 p.m. Ketchum was placed in the intensive care unit (ICU) for recovery.

When examined in 1989, Mrs. Ketchum was found to be suffering from severe mental retardation. The primary basis for this lawsuit is Ketchum's contention that her present condition is the result of negligent nursing care that she received in the ICU of Overlake during the night shift—11 p.m. to 7 a.m.—following the operation.

The testimony at trial focused on the degree to which Ketchum's condition may have deteriorated during the night shift, whether the Overlake nurse adequately assessed and documented Ketchum's condition during this period, whether the nurse properly informed Dr. Maxwell of Ketchum's condition during the night, and whether Ketchum's present condition was the result of the allegedly negligent care that she received during this shift or whether the damage had occurred prior to the operation.

Patricia Tobis, a registered nurse, testified that the Overlake nurse had inadequately assessed and documented Ketchum's neurological condition during the night shift. According to Tobis, Ketchum's night shift chart indicated that the nurse had failed to document adequate responses to a series of warning signs, including respiratory distress, elevated pulse, and reduced pupilar response, all signs of Ketchum's possible deteriorating condition. Tobis was concerned that Ketchum's chart did not indicate that Dr. Maxwell had been adequately informed of the warning signs.

Dr. Robert Rand, a professor of neurosurgery, also testified for the plaintiff. Rand, who examined Ketchum in 1989, stated that a reasonably prudent ICU nurse would

have reported the warning signs to Dr. Maxwell. In Rand's opinion, the warning signs indicated that Ketchum was experiencing brain stem compression during the night shift. According to Dr. Rand, if Dr. Maxwell had been informed of these warning signs, he could have prescribed a diuretic, which would have relieved the pressure on Ketchum's brain, and the damage causing Ketchum's current condition would probably not have occurred. Dr. Rand further opined that Ketchum's present condition was not caused by the two hemorrhages, the vasospasm, or the surgery.

The defense presented several experts who testified that Ketchum's condition had not significantly deteriorated during the night shift and that the nurse's assessment and documentation of Ketchum's condition met the applicable standard of care. These witnesses stated that the nurse had fully and appropriately informed Dr. Maxwell of Ketchum's condition during the three telephone conversations she had with him during the night shift. The defense also presented evidence tending to show that Ketchum may have suffered permanent damage prior to her surgery.

The jury returned a verdict in favor of the defendant, and this appeal timely ensued.

Ketchum contends that the trial court erred in giving the emphasized portion of instruction 12, which provided:

> *The testimony of other health care providers that they would have followed a different course of treatment, or disagreement between health care providers as to what the treatment should have been, is not enough to establish negligence.*
>
> A health care provider is negligent only if he or she fails to possess and exercise that degree of skill, care and learning which is ordinarily possessed and exercised by reasonably prudent members of that profession in the same or similar circumstances.

(Italics ours.) Ketchum maintains that instruction 12 is confusing and misleading because it essentially informed the jurors that even if they believed plaintiff's witnesses, they should nonetheless find no negligence because the defendant's experts "disagreed" with the plaintiff's experts.

█ No appellate court in this state has expressly approved or disapproved an instruction similar to instruction 12. The general principle embodied in the first paragraph of instruction 12 was formulated in *Richison v. Nunn,* 57 Wn.2d 1, 340 P.2d 793 (1959), *cert. denied,* 364 U.S. 816 (1960), where the court stated that the

> testimony of other physicians that they would have followed a different course of treatment than that followed by the defendant, or a disagreement of doctors of equal skill and learning as to what the treatment should have been, does not establish negligence.

*Richison,* at 16. In *Richison,* the court reversed a plaintiff's verdict, holding that the plaintiff's own experts had been unable to agree about the plaintiff's diagnosis or about its cause. Under these circumstances, the court found that there was insufficient evidence to submit the issue of negligence to the jury. Thus, *Richison* provides scant support for the giving of instruction 12 and, indeed, suggests that such an instruction would be inappropriate:

> This is not a case in which the medical men called to testify for the plaintiff are in agreement with each other as to the diagnosis or cause of the plaintiff's condition, but are in disagreement with those who testify for the defendant. *In such a case, the jury is entitled to choose between the conflicting testimony.* But in this case, the doctors called to testify on behalf of the plaintiff were not in accord in their diagnosis of her condition, much less in their theories of its cause . . ..

*Richison,* at 16. *Accord, Versteeg v. Mowery,* 72 Wn.2d 754, 435 P.2d 540 (1967) (plaintiff failed to establish prima facie case).

In *Miller v. Peterson,* 42 Wn. App. 822, 714 P.2d 695, *review denied,* 106 Wn.2d 1006 (1986), the defendant challenged the trial court's *failure* to give an instruction similar to the first paragraph of instruction 12. The *Miller* court noted that this type of instruction relates to the plaintiff's duty to establish the appropriate standard of care by means of expert testimony. *Miller,* at 832. Because there was expert testimony establishing the standard of care in the case before it and because the jury was instructed on the applicable standard of care, the *Miller* court determined

that the failure to give the instruction was not error. *Miller* does not, however, otherwise address the propriety of such an instruction.

In *Klink v. G.D. Searle & Co.*, 26 Wn. App. 951, 614 P.2d 701, 9 A.L.R.4th 364 (1980), the court held that it would have been prejudicial error to give an instruction containing language similar to the first paragraph of instruction 12 because there was no evidence that the defendant doctor's challenged treatment was recognized as proper by any expert. *Klink*, at 955. The court does not, however, consider whether such an instruction might be appropriate under other circumstances.

In *Watson v. McNamara*, 229 Neb. 1, 424 N.W.2d 611 (1988)[1] and *Greenberg v. Bishop Clarkson Mem. Hosp.*, 201 Neb. 215, 266 N.W.2d 902 (1978),[2] the court held that the giving of instructions similar to the first paragraph of instruction 12 was reversible error. The court found that such an instruction, when there was sufficient evidence to establish a prima facie case of negligence, "permitted the jury to infer that the plaintiff's experts' testimony, even if believed, did not establish negligence and was not enough

---

[1]The instruction challenged in *Watson* provided:

"An Obstetrician–Gynecologist is not bound to use any particular method of diagnosis or treatment, and if, among Obstetrician–Gynecologists of ordinary skill and learning, more than one method of diagnosis or treatment is recognized as proper, it is not negligence for an Obstetrician–Gynecologist to adopt any of such methods. The fact that some other method of diagnosis or treatment existed, or the fact that some other specialist testified in this case that he might or would have used or advised another of a different method, does not, standing alone, establish that the defendant made or gave improper diagnosis or treatment; nor would it be an act of negligence or impropriety for the defendant not to have adopted another method." *Watson*, at 2.

[2]The instruction challenged in *Greenberg* provided: "'The testimony of other physicians that they would have followed a different course of treatment than that followed by the defendant, Dr. James Wax, or a disagreement of doctors of equal skill and learning as to what the treatment should have been, does not establish negligence. It is not enough merely to present the testimony of a doctor who would have acted differently, or who is willing to express the opinion that treatment should have been performed differently.'" *Greenberg*, at 221.

to establish the plaintiff's case." *Watson,* at 2–3. *Accord, Ourada v. Cochran,* 234 Neb. 63, 449 N.W.2d 211 (1989).

Overlake maintains that the instructions in *Watson* and *Greenberg* are distinguishable because they involved only the first paragraph of instruction 12. This argument is unpersuasive because the second paragraph of instruction 12 does no more than repeat the applicable standard of care, which was already before the jury in other instructions. The juries in both *Watson* and *Greenberg* were also instructed on the appropriate standard of care, albeit in a separate instruction. Moreover, in a subsequent case, the Nebraska Supreme Court found the following instruction, similar to both paragraphs of instruction 12, to be as prejudicial as the instructions in *Greenberg* and *Watson:*

> Evidence of other physicians that they would have followed a different course of treatment than that followed by the defendants, or a disagreement of doctors of equal skill and learning as to what the treatment should have been, does not establish negligence. Proof of a difference in judgment cannot amount to a proof of malpractice or medical negligence since such differences of opinion are consistent with the exercise of due care, or even the highest degree of care. The standard is set by the learning, skill and care ordinarily possessed and practiced by others of the same profession in good standing in the area of Lincoln or similar communities at that time.

*Denesia v. St. Elizabeth Comm'ty Health Ctr.,* 235 Neb. 151, 164, 454 N.W.2d 294, 303 (1990).

While the general principle of law underlying instruction 12 may be appropriate in analyzing a prima facie case of negligence, it is incomplete and misleading once the issue of negligence is submitted to the jury. *See Greenberg,* at 221–22. Instruction 12 informed the jury that expert testimony regarding a different course of treatment and that a disagreement among experts regarding the appropriate treatment "is not enough to establish negligence." By implying that such testimony can *never* establish negligence, instruction 12 comes close to commenting on the evidence. As the court in *Denesia* observed,

[t]he reality is that such testimony may or may not establish negligence; it does if the different course would have been followed because the course actually employed failed to meet the required standard, but does not if the course actually employed was one of several which met the required standard.

*Denesia,* at 167. We are not persuaded by Overlake's contention that this critical distinction is adequately conveyed by a repetition of the applicable standard of care.

In a supplemental brief, Overlake for the first time cites several decisions approving instructions that contain "concepts similar to those in Instruction No. 12." Supplemental Brief of Respondent, at 14. *See, e.g., Hodges v. Effingham Cy. Hosp. Auth.,* 182 Ga. App. 173, 355 S.E.2d 104 (1987); *Brackett v. Coleman,* 525 So. 2d 1372 (Ala. 1988). A review of these decisions reveals that the instructions differ in significant respects from instruction 12. In addition, the nature of the challenges raised, as well as the underlying factual circumstances, differ from the instant case.

Finally, Overlake maintains that instruction 12 was necessary under the particular circumstances of this case. The trial court indicated that it gave instruction 12 primarily because of the testimony of Patricia Tobis, the plaintiff's primary expert on the standard of care for an ICU nurse. On several occasions, Tobis qualified her answers with "in my experience" or with a description of what she would have done or had done under certain circumstances. In some instances, Tobis was unable or unwilling to relate her experience to the applicable standard of care. In other cases, her testimony was directly linked to the standard of care.

We need not decide, for purposes of this opinion, whether such testimony generally justifies or requires the giving of a specific instruction informing the jury how to weigh, evaluate, and otherwise consider such evidence as it may bear upon a claimed violation of the standard of care. At the very least, however, any such instruction must contain a complete and neutral statement of the applicable law. Instruction 12 failed to meet this standard.

Because of our resolution of this case, we do not reach the other alleged errors raised by Ketchum.

Reversed and remanded.

GROSSE, C.J., and WEBSTER, J., concur.

Reconsideration denied March 7, 1991.

Review denied at 117 Wn.2d 1004 (1991).