Nicholas **WALLBANK** and Mindilee **Wallbank**, individually and as parents of Emily Wallbank, a minor, Plaintiffs–Appellees,

v.

Steven S. **ROTHENBERG, M.D.,** Defendant–Appellant.

No. 01CA1949.

Colorado Court of Appeals, Div. IV.

Jan. 2, 2003.

Certiorari Granted July 21, 2003.

Leventhal, Brown & Puga, P.C., Natalie Brown, Anthony Viorst, Denver, Colorado, for Plaintiffs–Appellees.

Pryor, Johnson, Montoya, Carney & Carr, P.C., Irving G. Johnson, Elizabeth C. Moran, Aaron P. Bradford, Englewood, Colorado, for Defendant–Appellant.

Montgomery, Little & McGrew, P.C., Patrick T. O'Rourke, Englewood, Colorado, for Amicus Curiae Physician Insurers Association of America.

Mahoney Law Firm, Kevin S. Mahoney, Lakewood, Colorado, for Amicus Curiae Colorado Trial Lawyers Association.

Opinion by Judge TAUBMAN.

In this medical malpractice case, defendant, Steven S. Rothenberg, M.D., appeals the judgment entered on a jury verdict in favor of plaintiffs, Nicholas and Mindilee Wallbank, individually and as parents of Emily Wallbank. We affirm the judgment, but vacate the award for future medical expenses, reverse the trial court's determination not to reduce the jury's award in accordance with the one million dollar limitation on total damages under the Health Care Availability Act (HCAA), and remand for further proceedings.

This dispute arose from surgery that Rothenberg performed on six-week-old Emily Wallbank to remove a growth on her neck called a cystic hygroma. During surgery, Emily's facial nerve was injured, causing a partial paralysis of the right side of her face. In their lawsuit, the Wallbanks alleged that Rothenberg was negligent in not obtaining a CT scan or MRI before surgery to determine the extent of the growth on Emily's face. They also alleged that Rothenberg did not obtain their informed consent to surgery because he did not advise them of the risk of facial nerve injury or of alternatives to surgery.

Following a trial, the jury returned a verdict in favor of the Wallbanks on both the negligence and informed consent claims, awarding them a total of $1,348,560 in damages. Specifically, the jury awarded as damages $12,560 for past medical expenses, $80,000 for future medical expenses, $73,500 for lost future earnings, $182,500 for future noneconomic losses, and $1,000,000 for physical disfigurement. The trial court later denied Rothenberg's motions for new trial and to amend the judgment, and this appeal followed.

## I. Testimony Concerning the Personal Practices of Expert Witnesses

Rothenberg argues that the trial court committed an error of law in permitting the Wallbanks to question the experts regarding their personal practices. We disagree.

Ordinarily, we review trial court ruling admitting or excluding evidence under an abuse of discretion standard. *Hock v. New York Life Ins. Co.*, 876 P.2d 1242, 1251 (Colo. 1994). A court abuses its discretion when it rules based on an erroneous application of the law. *See Buckmiller v. Safeway Stores, Inc.*, 727 P.2d 1112 (Colo.1986).

A trial court's exercise of discretion should not be overturned on appeal unless its ruling was manifestly arbitrary, unreasonable, or

unfair. *People v. Moya,* 899 P.2d 212 (Colo. App.1994).

In a medical malpractice case, the relevant standard of care is that of a reasonably careful physician acting as a specialist in the same field of practice. *See Short v. Kinkade,* 685 P.2d 210 (Colo.App.1983); *see also* CJI–Civ. 4th 15:3 (2001). To determine whether the applicable standard of care has been violated, the jury must compare the defendant's conduct with what a reasonably careful physician would do under the same circumstances. *See Greene v. Thomas,* 662 P.2d 491 (Colo.App.1982); *see also* CJI–Civ. 4th 15:3 (2001).

Because the applicable standard of care is not within the common knowledge and experience of ordinary people, the standard must be established by expert testimony in a medical malpractice case. *United Blood Servs. v. Quintana,* 827 P.2d 509, 520 (Colo.1992).

However, a determination of the nature and existence of a generally accepted standard of medical practice cannot be determined simply by counting how many physicians follow a particular practice. *State Bd. of Med. Exam'rs v. McCroskey,* 880 P.2d 1188, 1194 (Colo.1994). According to the *McCroskey* court: "[A]scertaining the objectively reasonable standard of care is more than just a factual finding of what all, most, or even a 'respectable minority' of physicians do, although the actual practice in a community is certainly the starting point in any analysis." *State Bd. of Med. Exam'rs v. McCroskey, supra,* 880 P.2d at 1194–95; *see also Denver & Rio Grande R.R. v. Vitello,* 34 Colo. 50, 81 P. 766 (1905)(holding that it was error to permit expert witnesses to testify as to what they would have done under circumstances similar to the train derailment at issue).

Here, in addition to Rothenberg, one expert testified on his behalf, while two experts testified on behalf of the Wallbanks. One of the Wallbanks' experts testified that the failure of Rothenberg to obtain a CT scan or MRI prior to operating on Emily was below the preoperative standard of care for physicians performing cystic hygroma sur-

gery. The Wallbanks' other expert testified that while the standard of care would not necessarily have required obtaining a CT scan or MRI prior to surgery, she herself would have done so.

Rothenberg's expert testified that obtaining a CT scan or MRI was not required by the applicable standard of care, but that he personally would have obtained those tests before performing cystic hygroma surgery.

In denying the motion in limine, and again during trial when the Wallbanks' expert testified that obtaining a CT scan or MRI was not required by the standard of care, the trial court ruled that such testimony of the experts' personal practices was admissible and relevant as some evidence of the standard of care, as long as additional evidence was presented that Rothenberg's conduct fell below the standard of care.

Rothenberg argues that such evidence is irrelevant, because the personal preferences of a particular expert do not establish the standard of care. Indeed, Rothenberg maintains, such evidence is irrelevant because a practice different from that personally followed by an expert witness may also fall within the applicable standard of care. We are not persuaded.

While *McCroskey* and *Vitello* make it clear that a standard of care may not be established by the testimony of the personal practices of expert witnesses, those cases do not address whether this testimony may be relevant when other evidence is presented concerning the applicable standard of care. This question is a matter of first impression for Colorado appellate courts.

We conclude, as did the trial court, that testimony concerning the experts' personal practices was of some relevance because each expert also testified concerning the applicable standard of care. We reach this conclusion for the following reasons.

First, as the *McCroskey* court noted, "the actual practice in a community" is the starting point in determining a reasonable standard of care. Thus, once the expert testifies concerning the standard of care, then testimony of that expert's personal

practices may help the jurors understand why that standard of care is followed by that expert or other experts.

Second, testimony regarding an expert's personal practices may either bolster or impeach the credibility of that expert's testimony concerning the standard of care. Here, the Wallbanks' expert who stated that the standard of care did not require obtaining a CT scan or MRI nevertheless stressed the importance of obtaining those tests when questioned about why she did so on a regular basis. Under CRE 607, the Wallbanks could impeach their own expert. Similarly, the Wallbanks properly cross-examined Rothenberg's expert concerning his personal practice to obtain tests, when he testified that the standard of care did not require obtaining a CT scan or MRI. *See* C. Frederick Overby, *Trial Practice and Procedure,* 51 Mercer L.Rev. 487, 501–02 (1999)("The relevance and importance of a medical expert's personal choice of a course of treatment is highly probative of the credibility of the expert's opinion concerning the standard of care. A jury is free to disregard the expert's opinion entirely and find that the standard of care is reflected by the course of treatment the expert would have chosen, a highly probable scenario if other evidence admitted in the case supports this proposition.").

Third, because each expert addressed the applicable standard of care, testimony regarding their personal practices was proper direct and cross-examination. Thus, the jury could give whatever weight it determined was appropriate to the testimony of those experts, including ignoring it completely. Similarly, during closing argument, counsel for each party was able to argue the significance of the experts' testimony as to their personal practices. Also, the jury was properly instructed concerning the applicable standard of care.

Accordingly, we conclude that the trial court did not abuse its discretion nor err as a matter of law in allowing the experts here to testify about their own practices as well as the applicable standard of care. *See, e.g., Greenberg v. Bishop Clarkson Mem'l Hosp.,* 201 Neb. 215, 266 N.W.2d 902, 907 (1978)(testimony that a physician would have acted differently from defendant, although not normally admissible, may be considered where ample medical testimony establishes the applicable standard of care); *Miller v. Peterson,* 42 Wash.App. 822, 714 P.2d 695 (1986)(while testimony reflecting only a personal opinion of experts that they would have followed a different course of treatment from that of the defendant is insufficient to establish a standard of care, there was no error to allow such testimony, because there was expert testimony on the standard of care and the jury was given the proper standard of care instruction).

## II. Award of Damages

Rothenberg contends that the judgment must be reduced to comply with the damages limitation of the HCAA, § 13–64–302, C.R.S. 2002. We agree in part.

### A. Physical Impairment and Disfigurement

Rothenberg first argues that the damages awarded for physical impairment and disfigurement are subject to HCAA's one million dollar damages limitation in this medical negligence case. We agree.

The interpretation of a statute is a question of law, which appellate courts review de novo. *City of Colorado Springs v. Conners,* 993 P.2d 1167, 1171 (Colo.2000).

A court's task when interpreting a statute is to ascertain and give effect to the legislative intent. Courts first look to the plain language of the statute to determine the General Assembly's intent. "If courts can give effect to the ordinary meaning of words used by the legislature, the statute should be construed as written, giving full effect to the words chosen, as it is presumed that the General Assembly meant what it clearly said." *State v. Nieto,* 993 P.2d 493, 500 (Colo.2000). Courts should avoid statutory constructions that defeat the clear intent of the General Assembly. *People v. District Court,* 713 P.2d 918, 921 (Colo.1986).

The HCAA's liability limitation provides in pertinent part:

The *total amount recoverable* for all damages for a course of care for all defendants in any civil action for damages in tort

brought against a health care professional ... whether past damages, future damages, or a combination of both, *shall not exceed one million dollars,* present value per patient ... of which not more than two hundred fifty thousand dollars, present value per patient ... shall be attributable to noneconomic loss or injury, as defined in section 13–21–102.5(2)(a) and (2)(b), whether past damages, future damages, or a combination of both; *except* that if, upon good cause shown, the court determines that the present value of the amount of lost past earnings and the present value of lost future earnings, or the present value of the amount of past medical and other health care costs and the present value of the amount of future medical and other health care costs, or both, when added to the present value of other past damages and the present value of other future damages, would exceed such limitation and that the application of such limitation would be unfair, the court may award the present value of additional future damages only for loss of such excess future earnings, or such excess future medical and other health care costs, or both.

Section 13–64–302(1), C.R.S.2002 (emphasis added).

Here, the damages limitations contained in § 13–64–302 are clear and unambiguous. *Colo. Permanente Med. Group, P.C. v. Evans,* 926 P.2d 1218, 1230 (Colo.1996).

In *Preston v. Dupont,* 35 P.3d 433 (Colo. 2001), the supreme court held that the $250,000 limitation on noneconomic damages under § 13–64–302 does not limit the amount of damages awarded for physical impairment or disfigurement. However, the *Preston* court did not determine whether damages for physical impairment or disfigurement are subject to the one million dollar limitation on total damages under § 13–64–302.

■ The parties agree that while the holding of *Preston* is not dispositive of the issue before us, this court should look to *Preston* for guidance. However, the parties sharply differ on the statutory interpretation *Preston* supports.

On the one hand, Rothenberg argues that *Preston* does not suggest that damages for physical impairment and disfigurement are exempt from the limitation on total damages. He notes that the HCAA's statutory scheme limits the total amount recoverable for all damages, and "The [*Preston* ] majority rationale does not question that the legislature intended to and successfully has limited common-law damages for physical impairment and disfigurement." *Preston v. Dupont, supra,* 35 P.3d at 443 (Coats, J., dissenting).

On the other hand, the Wallbanks assert the same reasoning the *Preston* court used to exclude damages for physical impairment and disfigurement from HCAA's $250,000 noneconomic damages limitation should likewise exclude such damages from the one million dollar limitation. According to the Wallbanks, any overall damages limitation must be guided by § 13–21–102.5(5), C.R.S. 2002, which provides, "Nothing in this section shall be construed to limit the recovery of compensatory damages for physical impairment or disfigurement." *See Preston v. Dupont, supra,* 35 P.3d at 440.

However, § 13–64–302(1) of the HCAA refers to the general damages statute, § 13–21–102.5(2)(a) and (2)(b), C.R.S.2002, only for its definition of noneconomic damages. In contrast, the provision in § 13–64–302(1) that "past damages, future damages, or a combination of both, shall not exceed one million dollars," does not refer to the general damages statute. Further, the statute on which the Wallbanks rely, § 13–21–102.5(5), is itself expressly limited to "this section" and, therefore, does not govern our interpretation of § 13–64–302(1).

Accordingly, we conclude that § 13–21–102.5(5) does not apply to the one million dollar total damages limitation contained in § 13–64–302(1).

Under a plain language analysis of § 13–64–302(1), damages for physical impairment or disfigurement are subject to HCAA's one million dollar total damages limitation in medical negligence actions. The General Assembly used the mandatory term "shall" to limit the "total" amount of damages to one million dollars. *See People in Interest of E.S.,* 49 P.3d 1221, 1223 (Colo.App.2002)("In

construing a statute, the word 'shall' is given a mandatory connotation.").

Moreover, the General Assembly specified the types of damages, namely lost future earnings and future medical expenses, that are exempt from the one million dollar damages limitation. Had the General Assembly intended damages for physical impairment and disfigurement to be exempt from the one million dollar limitation, it could have easily included this category of damages in the specific exemptions. *See Holdridge v. Bd. of Educ.,* 881 P.2d 448, 450 (Colo.App. 1994)(where statute specifies certain situations to which it applies, it must be interpreted to exclude from its operation other situations not specified).

Because the statutory language is clear and unambiguous, we apply it as written, and we need not resort to other rules of statutory construction or consider legislative history. *See People v. Triantos,* 55 P.3d 131, 134 (Colo.2002); *see also State v. Nieto, supra.* Thus, we conclude the trial court should have applied the one million dollar limit here.

### B. Future Medical Expenses and Lost Earnings

Rothenberg next contends the court did not find and the evidence does not establish that "good cause" justified an award of lost future earnings or medical expenses in excess of the one million dollar limit and that application of this limit would be unfair. We agree in part and conclude a remand for further proceedings is necessary.

■ The Wallbanks argue the trial court implicitly made the findings necessary for awarding damages in excess of the one million dollar limit when it adopted their position regarding the exceptions to the limit in its order denying Rothenberg's motion to reduce the judgment. However, the trial court's order simply stated the motion was "denied" without discussing good cause or unfairness.

We are not persuaded by the Wallbanks' argument that *Herrera v. Gene's Towing,* 827 P.2d 619 (Colo.App.1992), warrants the conclusion that implied findings are sufficient here. There, a division of this court determined that the trial court was not required to make specific findings that an award of non-economic damages in excess of $250,000 had been proved by clear and convincing evidence, the statutory standard of proof under § 13–21–102.5(3)(a), C.R.S.2002. Here, in contrast, the trial court's articulation of factors establishing good cause and unfairness in application of the one million dollar cap would be readily subject to review for abuse of discretion.

#### 1. Future Medical Expenses

■ "An award of future medical expenses must be based upon substantial evidence which establishes the reasonable probability that such expenses will necessarily be incurred." *Reynolds v. Reichwein,* 510 P.2d 895, 896 (Colo.App.1973)(not published pursuant to C.A.R. 35(f)).

■ Here, the record does not support an award of future medical expenses. No evidence suggests future medical expenses necessarily will be incurred. While there was evidence that Emily Wallbank could benefit from reconstructive surgery at a young age, her mother testified that Emily, with input from her parents, would make that decision.

Additionally, even the approximate cost of this surgical procedure was not presented to the jury. Instead, the Wallbanks elicited testimony that Rothenberg charged $2,000 for the surgery he performed. In closing statement, the Wallbanks' counsel asked the jury to "use that as a starting place to evaluate the cost of future medical care."

Therefore, we conclude that there was insufficient evidence as a matter of law to support an award for future medical expenses. *See Reynolds v. Reichwein, supra.* Accordingly, we vacate that award.

#### 2. Lost Future Earnings

■ The determination whether to award damages for lost future earnings for a minor and in what amount, if any, "is left to the sound judgment and experience of the jury" because it is impossible to provide evidence of the value of a minor's future lost wages.

*Stewart v. Rice,* 25 P.3d 1233, 1236 (Colo. App.2000), *rev'd on other grounds,* 47 P.3d 316 (Colo.2002).

■ Here, the Wallbanks' vocational rehabilitation expert testified that, according to literature on the subject, persons who have a facial disfigurement may encounter difficulties upon entering the workforce in obtaining certain types of employment because "the biggest problem in employment is probably the first impression people make, and if you don't get past the first impression, if you don't get an employer to see beyond their initial instinct, you won't be hired." We conclude this testimony was sufficient to support the award of $73,500 for lost future earnings.

Rothenberg filed a motion to amend the judgment, which the trial court summarily denied. The trial court did not address whether good cause existed for awarding damages in excess of the HCAA's one million dollar damage limitation or whether application of the limit to damages awarded for lost future earnings would be unfair.

Accordingly, we conclude a remand is necessary for further factual findings on this issue. *See Rocky Mountain Health Maint. Org., Inc. v. Colo. Dep't of Health Care Policy & Financing,* 54 P.3d 913, 918 (Colo.App.2001)(trial court must make sufficient findings to permit appropriate appellate review, providing an appellate court with "a clear understanding of the basis of its order"); *see also* C.R.C.P. 52. In addition, the trial court must enter an amended judgment for one million dollars and, in the event of appropriate findings of good cause and unfairness in application of the cap, for the award for lost future earnings as determined by the jury.

### C. Prefiling Interest

■ Finally, Rothenberg contends that the trial court erred in denying his motion to amend judgment because it did not specify that any award of prefiling interest must be limited under the HCAA. We agree.

Under § 13–64–302(2), C.R.S.2002, prejudgment interest "that accrues during the time period beginning on the date the action accrued and ending on the date of filing of the civil action is deemed to be a part of the damages awarded . . . and is included" within the HCAA's $250,000 limit on noneconomic damages and the one million dollar limit on total damages.

Here, although Rothenberg contended the trial court was required to apply the prefiling interest limitation to the judgment, the trial court denied the motion and made no findings regarding prefiling interest.

Under the one million dollar limitation, the Wallbanks may not recover additional amounts for prefiling interest. *See* § 13–64–302(2). Similarly, if the trial court finds good cause and unfairness justifying the award for lost future earnings, then prefiling interest also may not be awarded for that portion of the judgment that exceeds one million dollars, because prefiling interest is included in the total limit. *Cf. Scholz v. Metro. Pathologists, P.C.,* 851 P.2d 901 (Colo.1993)(holding, before enactment of § 13–64–302(2), that prefiling interest was not subject to one million dollar total damages limitation in the HCAA); *Shannon v. Colo. Sch. of Mines,* 847 P.2d 210 (Colo.App.1992)(prejudgment interest not recoverable on damages for future losses). However, the Wallbanks may recover postfiling prejudgment interest and postjudgment interest. *See* § 13–21–101, C.R.S. 2002.

Therefore, we conclude it is necessary to remand this matter to the trial court for further findings on this issue. *See Rocky Mountain Health Maint. Org., Inc. v. Colo. Dep't of Health Care Policy & Financing, supra; see also* C.R.C.P. 52.

The judgment is affirmed, except the award for future medical expenses is vacated, the trial court's determination not to reduce the amount of the judgment in accordance with the HCAA one million dollar limitation on total damages is reversed, and the case is remanded for further proceedings consistent with this opinion.

Judge WEBB and Judge PLANK *
concur.

---

\* Sitting by assignment of the Chief Justice under
provisions of Colo. Const. art. VI, § 5(3), and
§ 24–51–1105, C.R.S.2002.