[No. 28846-3-III.   Division Three.   March 10, 2011.]

LAJUANA LEAVERTON, *Appellant*, v. CASCADE SURGICAL PARTNERS, PLLC, ET AL., *Respondents*.

*Thomas R. Golden* (of *Otorowski Johnston Morrow & Golden PLLC*), for appellant.

*David A. Thorner* and *Megan Murphy* (of *Thorner Kennedy & Gano PS*), for respondents.

¶1 SWEENEY, J. — This appeal follows the summary dismissal of a medical negligence suit by a patient against her general surgeon. The plaintiff's experts are otolaryngologists (ear, nose, and throat specialists), not general surgeons, and each refused to comment on the "standard of care" for a general surgeon. The trial judge concluded that the failure to introduce opinions on the standard for a general surgeon was fatal to the patient's suit and he summarily dismissed her complaint. We conclude that the expert's familiarity with the disease and its management, surgically, is sufficient to submit the matter to jury and we therefore reverse the summary dismissal and remand for trial.

## FACTS

¶2 Lajuana Leaverton suffered from a multinodular goiter (enlargements of her thyroid) and hyperthyroidism (excessive secretions of her thyroid). Her physician referred her to Dr. Robert J. Conroy of Cascade Surgical Partners

PLLC (CSP) for surgical treatment. Dr. Conroy is board certified in general surgery.

¶3 He examined Ms. Leaverton and found an enlarged thyroid with several palpable nodules. He decided that a subtotal thyroidectomy (removal of only a portion of the thyroid) was more appropriate than a total thyroidectomy and so advised Ms. Leaverton. His medical judgment is generally based on the anatomy of the patient, the difficulty of dissection, and identification of certain laryngeal nerves. He also advised Ms. Leaverton of the risks associated with the surgery. Those risks included injury to what is called the recurrent laryngeal nerves. Ms. Leaverton agreed to the procedure.

¶4 Dr. Conroy performed a subtotal thyroidectomy on Ms. Leaverton in late November 2003. During the surgery, Dr. Conroy could not identify the left recurrent laryngeal nerve. He used "electrocautery" (cauterization using an electrical device) to divide the thyroid gland so he could remove part of it. Dr. Conroy was able to identify the right recurrent laryngeal nerve.

¶5 After the surgery, Ms. Leaverton had high-pitched, harsh sounding respiration, called stridor. Dr. Conroy consulted with another specialist, who examined Ms. Leaverton, evaluated her, and noted "mild vocal cord and vocal fold edema [and] bilateral cord abductor and adductor paralysis." Clerk's Papers (CP) at 108. The condition, inspiratory stridor, persisted, so Dr. Conroy referred Ms. Leaverton to Dr. Allen Hillel at the University of Washington Medical Center. He is an otolaryngologist. Dr. Hillel tried to correct the problem but he was unsuccessful. Ms. Leaverton's vocal cords remained fixed.

¶6 Ms. Leaverton sued Dr. Conroy and CSP for damages. She alleged that Dr. Conroy negligently performed the surgery. Ms. Leaverton disclosed Dr. Gregory K. Chan and Dr. Charles R. Souliere Jr. as expert witnesses during the discovery process. Both are otolaryngologists, not general surgeons. Both do total thyroidectomy surgeries; neither does subtotal thyroidectomies. Both were conversant with

Ms. Leaverton's condition and the techniques for surgically correcting that condition. Both expressed opinions that the cause of the injury was the use of electrocautery too close, within 0.5 centimeters, of the left recurrent laryngeal nerve. But neither would express an opinion on the "standard of care" for general surgeons and neither performed subtotal thyroidectomies as a matter of practice. Dr. Conroy and CSP moved for summary judgment, relying on the refusal of Dr. Chan and Dr. Souliere to express an opinion on the standard of care for a general surgeon.

¶7 The judge concluded that the refusal of Ms. Leaverton's experts to give opinions on the standard of care for a general surgeon was fatal to her claim and he dismissed her suit.

## DISCUSSION

¶8 Ms. Leaverton contends that her experts showed expertise in her medical condition and its management surgically and that should have been enough under the case law in this state to admit their opinions on the standard of care for treatment of this condition. Dr. Conroy contends that the trial judge got it right. He argues that neither of Ms. Leaverton's experts perform or have experience with subtotal thyroidectomies. Neither of them is a general surgeon or was prepared to express opinions on whether this general surgeon, Dr. Conroy, met the standard of care required of general surgeons. And so the trial judge properly dismissed the suit.

¶9 We review an order granting summary judgment de novo. *Hill v. Sacred Heart Med. Ctr.*, 143 Wn. App. 438, 445, 177 P.3d 1152 (2008). Like the trial judge, the question before us is whether Ms. Leaverton produced sufficient evidence to support the essential elements of a medical negligence claim. *Id.* In a medical negligence action, evidence concerning the standard of care and a breach of that standard must generally be shown by expert medical testimony. *Id.* at 446. We view the evidence, and any

inferences that may be drawn from that evidence, in a light most favorable to the nonmoving party, here Ms. Leaverton. *Id.* at 445.

¶10 Ms. Leaverton must then show that Dr. Conroy "failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider at that time in the profession or class to which he belongs, in the state of Washington, acting in the same or similar circumstances." RCW 7.70.040(1). She used the opinions of Dr. Chan and Dr. Souliere to try to do this.

SCOPE OF KNOWLEDGE

¶11 The scope of an expert's knowledge, not his or her professional specialty, governs " 'the threshold question of admissibility of expert medical testimony in a malpractice case.' " *Hill*, 143 Wn. App. at 447 (quoting *Pon Kwock Eng v. Klein*, 127 Wn. App. 171, 172, 110 P.3d 844 (2005)). "A physician with a medical degree is qualified to express an opinion on any sort of medical question, including questions in areas in which the physician is not a specialist, so long as the physician has sufficient expertise to demonstrate familiarity with the procedure or medical problem at issue in the : . . . action." *Id.*

¶12 Dr. Chan and Dr. Souliere both have medical degrees. Both have extensive experience in thyroid surgery and the potential complications, especially to recurrent laryngeal nerves. Both have basic training in general surgery. The trial judge agreed that Dr. Chan and Dr. Souliere "are both well-qualified board certified otolaryngologists, who have experience and familiarity with thyroid disease and thyroidectomy." CP at 79. They both have a working familiarity with the resulting complication here—paralysis of the vocal cords and resultant stridor.

¶13 Dr. Conroy argues, nevertheless, that these experts are not prepared to express opinions on the specific medical procedure at issue here, a subtotal thyroidectomy, and that is what he performed. Nor are they prepared to express opinions on the standard of care for a general surgeon

performing this surgery. But his argument couches the question before us too narrowly. The question is not whether Dr. Conroy was negligent for his decision to perform a subtotal thyroidectomy versus a total thyroidectomy or use of electrocauterization. The criticism of Dr. Conroy's work concerns how he went about the surgery. And that includes allegations that he failed to identify the left recurrent laryngeal nerve and used electrical cauterization too close to that nerve. Dr. Chan and Dr. Souliere were certainly competent to testify as to the diagnostic and general surgical procedures during a thyroidectomy, including identification and protection of the recurrent laryngeal nerve.

¶14  Dr. Chan has practiced as an otolaryngologist for over 34 years. At one point in his career, he was Chief of Otolaryngology at Providence Hospital in Seattle, Washington. He has performed 12 to 20 thyroidectomy surgeries per year for the last 10 years. Otolaryngologists treat thyroid disease, perform thyroid surgery, and are aware of the risks of using electocautery near the recurrent laryngeal nerve. Dr. Chan is familiar with the thyroidectomy surgery and the resulting potential for stridor and paralysis of the vocal cords.

¶15  Dr. Souliere, too, is familiar with thyroid disease and the surgical procedure of thyroidectomy. He is a board certified otolaryngologist. And he has performed 5 to 10 thyroidectomy surgeries per year for the last 15 years. He instructs general surgeons in the use of nerve monitoring during thyroidectomy surgery.

¶16  Both Dr. Chan and Dr. Souliere testified that the use of electrocautery within close proximity (less than 0.5 centimeters) of the recurrent nerve would be a violation of the standard of care for anyone who performs this surgery. CP at 134-35, 147-48.

¶17  We conclude that an otolaryngologist has the requisite knowledge about the standard of practice for anyone surgically treating this condition and should therefore be allowed to testify about that standard. Ms. Leaverton has

met her burden of production. *Hill*, 143 Wn. App. at 451. The weight that should be attributed to the opinions of Dr. Chan and Dr. Souliere—the burden of persuasion—is a matter for the jury. *Id.*

SCHOOLS OF MEDICINE

¶18 We also reject Dr. Conroy's assertion that these experts are from different schools of medicine and, thus, should not be allowed to testify. The testimony should be allowed (1) where the methods of treatment in the defendant's school and the school of the witness are the same, (2) where the method of treatment in the defendant's school and the school of the witness should be the same, or (3) where the testimony of a witness is based on knowledge of the defendant's own school. *Miller v. Peterson*, 42 Wn. App. 822, 831, 714 P.2d 695 (1986).

¶19 In *Miller*, the court held "that a practitioner of one school of medicine may testify against a practitioner of another school of medicine when the methods of treatment of the two schools are or should be the same." *Id.* at 832. The court in *Miller* ultimately allowed an orthopedic surgeon to testify about the standard of care for a doctor of podiatric medicine because the surgeon and podiatrist used the same methods of treatment. *Id.* at 831-32.

¶20 Dr. Conroy and CSP argue that otolaryngologists are from a different school of medicine than general surgeons. They argue that Dr. Chan and Dr. Souliere were not trained to perform subtotal thyroidectomies. They urge us to conclude from this that Dr. Chan and Dr. Souliere lack the requisite knowledge of a general surgeon in performing subtotal thyroidectomies because they are from a different school. Ms. Leaverton responds that Dr. Conroy, Dr. Chan, and Dr. Souliere are all from the same school—they are all medical doctors. And she argues that this case involves overlapping medical specialties in the same school of medicine and not differing schools of medicine.

¶21 It is true that both Dr. Chan and Dr. Souliere testified that otolaryngologists generally do not perform

subtotal thyroidectomies. But, again, both general surgeons and otolaryngologists do treat thyroid disease and perform thyroid surgery. Dr. Chan and Dr. Souliere testified that use of electrocautery within 0.5 centimeters of the laryngeal nerve is unacceptable for any surgeon performing thyroid surgery. Simply put, the methods of treatment of the two schools on this factual issue are, or should be, the same. *Id.* Whether Dr. Chan and Dr. Souliere are trained specifically in the specialty of general surgery does not control whether they can express opinions on how to properly perform thyroidectomy surgery. Any differences in training would go to the weight the jury should give to their testimony. *Hill*, 143 Wn. App. at 451.

STANDARD OF CARE

¶22  Finally, expert testimony on the standard of care does not have to be in standard-of-care terminology. *White v. Kent Med. Ctr., Inc.*, 61 Wn. App. 163, 172, 810 P.2d 4 (1991). We look instead to the substance of the allegations and the substance of what the experts bring to the discussion. "To require experts to testify in a particular format would elevate form over substance." *Id.* It is only necessary that an expert's opinion on the standard of care be based on general professional standards, rather than mere personal opinion. *Id.*

¶23  Dr. Conroy and CSP argue that Dr. Chan and Dr. Souliere cannot testify about the applicable standard of care for a general surgeon performing a subtotal thyroidectomy because both experts admitted they did not know the standard of care for a general surgeon. But, again, both testified that the use of electrocautery within 0.5 centimeters of the laryngeal nerve was below the standard of care for any surgeon. That is sufficient to submit this matter to a jury.

¶24  Dr. Conroy and CSP also discount the line of cases that define the scope of expert medical testimony. They argue that this case is different because both experts did not know the standard of care applicable to general surgeons. However, the threshold determination emphasized in all

these cases is whether a physician with a medical degree has sufficient expertise to demonstrate familiarity with the procedure or medical problem at issue, not whether the expert is capable of testifying about the specific training of a specific defendant. *See id.* at 173 (specialist allowed to testify as to the standard of care for a general practitioner); *Hall v. Sacred Heart Med. Ctr.*, 100 Wn. App. 53, 995 P.2d 621 (2000) (medical doctor permitted to testify as to the standard of care for an intensive care unit nurse); *Seybold v. Neu,* 105 Wn. App. 666, 19 P.3d 1068 (2001) (plastic surgeon allowed to testify as to the standard of care for an orthopedic surgeon specializing in musculoskeletal oncology).

¶25 What is at issue here is the surgical management of a medical problem—a diseased thyroid gland and whether the condition was appropriately or inappropriately managed. The experts manage this condition surgically. They are familiar with and prepared to testify about how the surgery should be done to avoid injury to the patient and specifically the injury that occurred here. For the courts to countenance any higher threshold for the admission of these expert opinions would be to countenance surgical procedures—subtotal thyroidectomies and use of electrocauterization too close to a nerve—when the state of the art and the safety of patients required something more, according to the experts in this field.

¶26 We reverse the summary judgment and remand for trial.

KORSMO, A.C.J., and SIDDOWAY, J., concur.

Review denied at 172 Wn.2d 1005 (2011).