110 P.3d 844 (2005)
Pon Kwock ENG, a widowed man and as Personal Representative of the Estate of Ping S. Eng, Appellant,
v.
Steven L. KLEIN, M.D. and Jane Doe Klein, husband and wife, individually and their marital community composed thereof; Gregory Moss, M.D. and Jane Doe Moss, husband and wife, individually and their marital community composed thereof; and Jane Does and John Does I-III, Respondents.
No. 54217-6-I.
Court of Appeals of Washington, Division 1.
April 25, 2005.
*845 Harry B. Platis, Platis Law Firm, Lynnwood, WA, for Appellant.
Tyna Ek, Merrick Hofstedt & Linsey, PS, Seattle, WA, for Respondents (Steven L. Klein, M.D. and Jane Doe Klein).
John C. Graffe, Johnson, Graffe, Keay, Moniz & Wick, LLP, Seattle, WA, for Respondents (Gregory Moss, M.D. and Jane Doe Moss).
GROSSE, J.
¶ 1 It is the scope of a witness's knowledge and not artificial classification by professional title that governs the threshold question of admissibility of expert medical testimony in a malpractice case. A practitioner of one school of medicine may testify regarding the practice in another school of medicine when the methods of treatment of the two are or should be the same. Because Dr. Vincent Quagliarello was knowledgeable as to the medical problem at issue, and the methods of treatment involved were not specialty specific, we find he was qualified to testify. Therefore, summary judgment was improperly granted.

FACTS
¶ 2 This is a medical malpractice and wrongful death action filed by Pon Kwock Eng on behalf of his deceased wife, Ping S. Eng, alleging that the defendants, Dr. Steven Klein and Dr. Gregory Moss, failed to diagnose and treat acute bacterial meningitis in a timely fashion.
¶ 3 On October 1, 1999, Dr. Jacob Young performed successful neurosurgery on Ping's back at Swedish Hospital Medical Center (Swedish). Ping was discharged on October 6 with a clean, dry wound and no fever or other surgical complications. On October 8, Pon contacted Dr. Klein, who was the neurosurgeon covering for Dr. Young, and reported that his wife had a high fever. Dr. Klein advised Pon to immediately take his wife to Swedish Emergency Department. There Ping was examined by the physician on duty, Dr. Peggy Goldman. Ping's symptoms included a 103.5 degree temperature, a mild headache, visual blurring and a drooping eyelid. Dr. Goldman ordered laboratory work and a CT scan of Ping's head and spine. The lab work revealed a normal urinalysis but an abnormal white blood cell count.
¶ 4 Somewhere between 9:30 and 10:30 p.m., Dr. Klein arrived at the emergency department to evaluate Ping's surgical wound for a possible infection. After his examination, "it seemed clear [to Dr. Klein] that her infection was not a result of Dr. Young's prior neurosurgical procedure or an *846 infection [of] the surgical wound."[1] After this examination and before the results of the CT scan were available, Ping was admitted to the hospital under Dr. Klein's care at approximately 10:00 p.m. Dr. Goldman wrote in her report:
MEDICAL DECISION MAKING: The patient appears to have a significant bacterial infection. We must rule out any source of infection in her surgical region. Her right papillary dilation is unclear of significance.
PLAN: I talked to Dr. Klein who was on call for Dr. Young and he came to the emergency department, saw the patient here and is writing the orders. He will follow through on the CAT scan. I did ask the radiologist to directly page Dr. Klein with the CAT scan results.[2]
¶ 5 Dr. Klein then attempted to contact Dr. Moss, an infectious disease specialist. He eventually reached Dr. Moss sometime between 1:00 and 2:00 a.m. on October 9. Based on his conversation with Dr. Moss and his own examination of Ping, Dr. Klein did not believe Ping needed any further work up prior to Dr. Moss's early morning rounds. Dr. Klein then went home.
¶ 6 Dr. Moss saw Ping for the first time on October 9 at 7:45 a.m. Over the next several hours, Dr. Moss performed tests on Ping to determine the nature of the infection. He also administered antibiotics. At 12:00 p.m. on October 10, he performed a lumbar puncture (spinal tap). Early in the morning of October 11, the results of the spinal tap revealed that Ping was suffering from a rare form of meningitis that both parties' experts agree was likely unrelated to Ping's neurosurgery. With this information in hand, Dr. Moss administered the appropriate antibiotic; however, Ping succumbed to the infection on October 21, 1999.
¶ 7 Pon filed a complaint against Dr. Goldman, Dr. Moss, Dr. Klein, and Swedish. Swedish was dismissed by stipulated order and the superior court granted summary judgment and dismissed the claims against Dr. Goldman. Dr. Klein also moved for summary judgment.
¶ 8 In opposition to summary judgment, Pon filed the declaration and deposition of Dr. Vincent Quagliarello, a Connecticut specialist in infectious diseases, and in particular the diagnosis and treatment of meningitis. Dr. Quagliarello testified during his deposition:
Q: You're really not familiar with what the standard of care for neurosurgeons in the [s]tate of Washington is, correct?
A: No. My opinions are purely on the basis of my knowledge of what would be national standard of care for diagnosing and treating meningitis, and my personal experience with neurosurgeons in my own practice. I have no experience with neurosurgeons in Washington.
. . .
Q: So let me make it clear. You are not testifying that Dr. Klein deviated from the standard of care owed by a neurosurgeon to a patient such as Ping Eng in the [s]tate of Washington in October 1999?
A: No. It would have to do with just being a physician of record, the attending physician of record, whoever that physician is.[3]
Relying on this testimony, Dr. Klein argued that Dr. Quagliarello was not qualified to testify as an expert regarding whether Dr. Klein breached the standard of care of a Washington neurosurgeon.
¶ 9 But during his deposition Dr. Quagliarello also testified that as a neurosurgeon Dr. Klein should be very familiar with the signs and symptoms, diagnosis and treatment of meningitis because it is a recognized complication of neurosurgery; that he should recognize the possibility of meningitis and know the necessity for a spinal tap; that he should know timely treatment is necessary; that Ping's symptoms when she arrived at Swedish were sufficient to raise a high enough *847 suspicion of meningitis to do a spinal tap after the CT scan was normal; and that Dr. Klein and Dr. Moss were responsible for doing the spinal tap because unlike Dr. Goldman, they had the result of the CT scan. There also was evidence that the standard of care for diagnosing and treating meningitis is not unique to Washington, but is a national standard, and that physicians learn how to do a spinal tap typically during the third year of medical school. Pon argued that in light of this evidence Dr. Quagliarello was qualified to testify regarding the standard of care in this case.
¶ 10 The superior court disagreed and granted Dr. Klein's motion for summary judgment on grounds that Pon's expert, Dr. Quagliarello, a Connecticut specialist in infectious diseases, "is not competent to testify as to the standard of care owed by Dr. Klein, a neurosurgeon."[4]
¶ 11 Pon petitioned for immediate appellate review under RAP 2.2(d) and we granted his petition.

ANALYSIS
¶ 12 The Washington statutes require a party alleging medical malpractice to show that the defendant healthcare provider "failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider at that time in the profession or class to which he belongs, in the state of Washington, acting in the same or similar circumstances."[5] In general, expert testimony is required to establish the standard of care.[6]
¶ 13 The general rule is that a practitioner of one school of medicine is incompetent to testify as an expert in a malpractice action against a practitioner of another school.[7] However, there are several well-established exceptions to this rule. These exceptions include circumstances where:
(1) the methods of treatment in the defendant's school and the school of the witness are the same; (2) the method of treatment in the defendant's school and the school of the witness should be the same; or (3) the testimony of a witness is based on knowledge of the defendant's own school.[8]
In Miller, this court applied these exceptions holding, "that a practitioner of one school of medicine may testify against a practitioner of another school of medicine when the methods of treatment of the two schools are or should be the same."[9] These exceptions have been applied in several subsequent cases.[10]
¶ 14 In White, we considered whether a specialist's testimony regarding the standard of care of a general practitioner could satisfy the plaintiff's summary judgment burden. In reversing the superior court's summary judgment order we explained that, "So long as a physician with a medical degree has sufficient expertise to demonstrate familiarity with the procedure or medical problem at issue, `[o]rdinarily [he or she] will be considered qualified to express an opinion on any sort of medical question, including questions in areas in which the physician is not a specialist.'"[11] Thus, "`[i]t is the scope of the witness's knowledge and not the artificial classification by title that should govern the *848 threshhold [sic] question of admissibility' of expert medical testimony in a malpractice case."[12]
¶ 15 The issue raised in this case is whether Pon's expert, Dr. Quagliarello, is competent to testify as to the diagnostic procedures for a patient who presents symptoms like those Ping presented. Pon alleges that Dr. Klein was negligent in not continuing to perform a differential diagnosis on Ping. A differential diagnosis, or differential etiology, is a standard scientific technique for identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated.[13] Pon alleges that given the nature of Ping's symptoms, Dr. Klein should have continued to perform tests on her to eliminate the likely causes of her symptoms, including potentially fatal ones such as meningitis. Ultimately, Pon argues that before going home for the night Dr. Klein should have ordered a spinal tap for Ping instead of calling an infectious disease specialist, and leaving further diagnostic measures to wait until morning.
¶ 16 Pon's expert, Dr. Quagliarello, is an infectious disease doctor specializing in the diagnosis and treatment of meningitis. According to his deposition testimony, he would have testified that a patient presenting symptoms like Ping should have raised a high enough suspicion of meningitis in Dr. Klein's mind to warrant ordering a spinal tap. His knowledge of the medical problem at issue in this case, diagnosing a patient presenting symptoms like Ping's, is uncontested. Therefore, he is competent to testify as to the medical problem in this case.
¶ 17 Furthermore, there is no evidence showing that Dr. Klein's failure to continue a differential diagnosis and ultimate failure to order a spinal tap are omissions particularized to his neurosurgical specialty. Dr. Quagliarello testified that in his experience neurosurgeons should be very familiar with the signs and symptoms, diagnosis and treatment of meningitis because it is a recognized complication arising from neurosurgery and that physicians learn how to do a spinal tap typically during the third year of medical school. Dr. Quagliarello concluded:
So my personal opinion would be that as a neurosurgeon, [Dr. Klein] should be very familiar with the signs and symptoms, diagnosis and treatment of meningitis. Now, that's not to say that he may not need to call in an expert to help him decide on exactly which antibiotics to choose and how long to treat them. That would be fine. But as far as recognizing the possibility of meningitis and knowing that a lumbar puncture is necessary to diagnose the meningitis, and to recognize that timely treatment is necessary in order to optimally improve the outcome of that patient, he should be aware of that, in my opinion.[14]
¶ 18 Nor did Dr. Quagliarello indicate that diagnostic methods vary according to geographic location. To the contrary, Dr. Quagliarello testified that his opinion was based on "what would be [the] national standards of care for diagnosing and treating meningitis."[15]
¶ 19 On the other hand, Dr. Klein has produced no evidence to demonstrate that the diagnostic methods at issue are different for neurosurgeons than for infectious disease specialists. Dr. Klein points to several depositions by doctors who evaded answering questions as to the standard of care required by Dr. Klein, claiming that they were not neurosurgeons, but failing to explain why that should matter in this case. The only testimony remotely supporting Dr. Klein's assertion is the testimony of infectious disease expert Dr. Peter Marsh who testified:
Q: ... I want to make it clear, though, whether you think there's a different *849 standard with respect to the evaluation of a fever between an infectious-disease doctor and a neurosurgeon.
A: Well, since they're totally different specialties, I would guess there's probably a different standard, but I can only speak to that of an infectious-disease specialist.[16]
Dr. Marsh's "guess" does not establish a difference in the standard of care between a neurosurgeon and an infectious disease doctor in this case, nor can it refute Dr. Quagliarello's actual knowledge that there should be no difference.
¶ 20 Nor has Dr. Klein shown that the standard of care varies with geographic location. In fact, Dr. Klein's experts concur that at least among infectious disease doctors, the standard of care for the diagnosis and treatment of meningitis is a national one.
¶ 21 Reading the evidence in the light most favorable to Pon, as we must, we find Dr. Quagliarello to be qualified to testify as to the diagnostic procedures for a patient presenting symptoms like those Ping presented. And because the evidence indicates that the methods of treatment in this case were not specialty-specific, we find Dr. Quagliarello competent to testify as to the standard of care in this case. The superior court's summary judgment order is reversed and the case remanded for a trial.
WE CONCUR: COLEMAN and SCHINDLER, JJ.
NOTES
[1] Clerk's Papers at 24.
[2] Clerk's Papers at 216-17.
[3] Clerk's Papers at 353, 369-70.
[4] Clerk's Papers at 127.
[5] See RCW 7.70.040(1).
[6] See Young v. Key Pharms., Inc., 112 Wash.2d 216, 228, 770 P.2d 182 (1989).
[7] Miller v. Peterson, 42 Wash.App. 822, 831, 714 P.2d 695 (1986) (citing 85 A.L.R.2d 1022 (1962)).
[8] Miller, 42 Wash.App. at 831, 714 P.2d 695.
[9] Miller, 42 Wash.App. at 832, 714 P.2d 695 (orthopedic surgeon could testify about podiatrist's standard of care so long as the surgeon and podiatrist used the same methods of treatment).
[10] See White v. Kent Med. Ctr., 61 Wash.App. 163, 810 P.2d 4 (1991)(specialist allowed to testify as to the standard of care for a general practitioner); Hall v. Sacred Heart Med. Ctr., 100 Wash. App. 53, 995 P.2d 621 (2000)(medical doctor permitted to testify as to the standard of care for an intensive care unit nurse); Seybold v. Neu, 105 Wash.App. 666, 19 P.3d 1068 (2001) (plastic surgeon allowed to testify as to the standard of care for an orthopedic surgeon specializing in musculoskeletal oncology).
[11] White, 61 Wash.App. at 173, 810 P.2d 4 (citing 5A K. Tegland, Washington Practice: Evidence § 290[2], at 386 (3d ed.1989)); see also Seybold, 105 Wash.App. at 680, 19 P.3d 1068.
[12] White, 61 Wash.App. at 174, 810 P.2d 4 (citing Fitzmaurice v. Flynn, 167 Conn. 609, 618, 356 A.2d 887 (1975)).
[13] See Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 807 (3d Cir.1997) (quoting Stedmans Medical Dictionary 428 (25th ed.1990)) (explaining, "Differential diagnosis is defined for physicians as the determination of which of two or more diseases with similar symptoms is the one from which the patient is suffering, by a systematic comparison and contrasting of the clinical findings.").
[14] Clerk's Papers at 106.
[15] Clerk's Papers at 353 (emphasis added).
[16] Clerk's Papers at 393-94 (emphasis added).