# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
# DIVISION ONE

| | | |
|---|---|---|
| STEPHEN NOEL, Individually and as Personal Representative of the Estate of Nathaniel Noel, | ) ) ) ) | No. 73633-7-I |
| Appellant, | ) ) ) | |
| v. | ) ) ) | |
| FRANCISCAN HEALTH SYSTEM d/b/a ST. CLARE HOSPITAL; IAN D. COWAN, M.D. and JANE DOE COWAN and the marital community comprised thereof, | ) ) ) ) ) ) ) | |
| Respondents, | ) ) | |
| DAN STEEN, M.D. and his spouse and the marital community comprised thereof; STATE OF WASHINGTON DEPARTMENT OF SOCIAL AND HEALTH SERVICES and JOHN AND JANE DOES 1-20, | ) ) ) ) ) ) ) ) | UNPUBLISHED OPINION FILED: October 19, 2015 |
| Defendants. | ) ) ) | |

VERELLEN, A.C.J. — Four-month-old Nathaniel Noel died two days after

Dr. Ian Cowan determined that a bruise on Nathaniel's left eye was the result of

accidental trauma, not abuse. Nathaniel's mother later pleaded guilty to second degree

murder. Nathaniel's father, individually and as personal representative, filed a lawsuit

for damages against Dr. Cowan, the hospital, and others. The father appeals the partial

summary judgment order dismissing his claims for wrongful death of a child and failure to report child abuse. He and the estate appeal the order granting the directed verdict for their remaining medical malpractice cause of action. The directed verdict was the result of an order limiting the testimony of their expert witness, Dr. Kenneth Coleman.

They argue the superior court abused its discretion when it limited Dr. Coleman's testimony on the postmortem pathology findings, predicted actions of Children's Protective Services (CPS) and the police, and the timing of Nathaniel's fatal blow. But it was within the discretion of the superior court to conclude that there was an inadequate foundation to allow Dr. Coleman to testify to those three specific topics. Because the father and the estate acknowledged that they did not have adequate evidence to establish causation in view of these limitations, it was not error to grant the directed verdict. The superior court did not err in dismissing the father's claims for wrongful death of a child and failure to report child abuse because he did not establish any genuine issue of material fact regarding proximate cause for either claim. Accordingly, we affirm.

## FACTS

Nathaniel Noel and his twin brother were born 13 weeks premature on October 14, 2007. On December 11, 2007, Nathaniel returned home from the hospital to his mother, Domenique Conway, and his father, Stephen Noel.[1] His twin remained hospitalized until February 2008, when he was placed into voluntary medical foster care.

---

[1] To avoid confusion, Nathaniel and his parents are referred to by their first names.

On March 7, 2008, Domenique took Nathaniel to the St. Clare Hospital emergency department. Dr. Ian Cowan evaluated Nathaniel for a "swollen and blackened" left eye.[2] According to Domenique, she "woke up and saw his eye swelling."[3] She told Dr. Cowan she thought "one of [her] older kids threw a toy in his crib and hurt his eye."[4]

Nathaniel's emergency room care record indicated he was sleeping during his evaluation, but that he woke "to touch."[5] It also noted his injury was "mild" and that he "appear[ed] well."[6] Dr. Cowan determined that Domenique was appropriately concerned for Nathaniel's health and that her explanation relating to the cause of the injury matched Nathaniel's bruising. He expressly noted in Nathaniel's care record: "History is consistent w[ith] observed injury. Mom appropriate. I do not suspect [non-accidental trauma]."[7] Dr. Cowan discharged Nathaniel with instructions for caring for his eye contusion. Having examined him on Friday evening, Dr. Cowan also provided instructions to follow up with Nathaniel's doctor the following Monday.

On March 9, 2008, two days after Nathaniel's emergency room visit, paramedics responded within minutes to a 911 call that Nathaniel had stopped breathing. Nathaniel was reported dead at the scene. Detective Sergeant Teresa Berg from the Pierce County Sheriff's Department also responded to the scene. She determined that the

---

[2] Clerk's Papers (CP) at 1377.

[3] Id.

[4] Id. at 1094.

[5] Id. at 1047.

[6] Id. at 1045.

[7] Id. at 1046.

bruise on Nathaniel's left eye was "on the eyelid rather than around his eye as would typically be seen in a black eye inflicted by a punch."[8]

A postmortem examination report identified Nathaniel's cause of death as the result of "blunt force trauma of [the] head."[9] The pathologist who performed the examination testified that the trauma occurred less than 24 hours before death:

Q.	Just so I understand, what, in your opinion, was the cause of death of this child?

A.	In this case it would be blunt force trauma to the head.

Q.	And that was, in your opinion, what, less than three days from the date of the death?

A.	Definitely, yes.

Q.	You say, "Definitely, yes." What do you mean by that?

A.	Well, I think it's more likely that it was much less than that. I think it was more recent than that. With the subdural—the hemorrhage from the subdural, you're looking at less than 24 hours.[10]

Domenique pleaded guilty to murder in the second degree and was sentenced to 23 years in prison. The statement on plea of guilty and statement to the prosecutor recited that "[o]n about March 5, 2008[,]" Domenique "struck Nathaniel twice in the side of his head."[11]

On February 4, 2011, Stephen and the estate sued Franciscan Health System, doing business as St. Clare Hospital (FHS), Dr. Cowan, the State of Washington

---

[8] Id. at 1383.

[9] Id. at 527.

[10] Id. at 2175.

[11] Id. at 1069.

Department of Social and Health Services, and others for damages in Pierce County Superior Court. The amended complaint alleged (1) medical malpractice, (2) wrongful death of a child pursuant to RCW 4.24.010, (3) negligent investigation pursuant to RCW 26.44.050, (4) negligent infliction of emotional distress, (5) outrage, and (6) failure to report child abuse pursuant to RCW 26.44.030. FHS filed a motion for summary judgment to dismiss Stephen's and the estate's claims; Dr. Cowan joined in the motion. The superior court granted summary judgment in part, dismissing the claims of outrage and negligent infliction of emotional distress against FHS and Dr. Cowan.

FHS and Dr. Cowan filed motions for summary judgment seeking, in part, to dismiss Stephen's claims for wrongful death of a child under RCW 4.24.010 and failure to report child abuse under RCW 26.44.030. The superior court granted partial summary judgment and ordered that

> Plaintiffs' claims of medical negligence (Plaintiffs' First Cause of Action) are limited to include provable damages under RCW 4.20.046, consisting of economic damages only, on the grounds that there are no statutory beneficiaries as required under the wrongful death and survival statutes.
>
> . . . Plaintiffs' claims of injury or death of a child under RCW 4.24.010 (Plaintiffs' Second Cause of Action) are dismissed on the grounds that the Estate of Nathaniel Noel is not entitled to recovery under this statute and there is no proximate cause relating to the death of the child with respect to Stephen Noel's claim.
>
> . . . Plaintiffs' claims for violation of RCW 26.44.030 (Plaintiffs' Sixth Cause of Action) are dismissed on the grounds that this is a survival claim for which there are no statutory beneficiaries and because there was no subjective suspicion of abuse.[12]

---

[12] Id. at 1735-1736.

The case was set for trial to determine Stephen's and the estate's remaining medical malpractice claim.

Prior to trial, FHS and Dr. Cowan filed joint motions in limine to limit the testimony of Stephen's and the estate's expert witness, Dr. Kenneth Coleman. They argued that the pathology issues extended beyond the scope of Dr. Coleman's expertise and that he based his causation opinions relating to the postmortem pathology findings on his consultation with two other pathologists, Dr. Carl Wigren and Dr. Jeff Reynolds, rather than on his own interpretation of the findings. FHS and Dr. Cowan also argued that Dr. Coleman based his causation opinion on speculation and conjecture regarding the predicted actions of CPS and the police department, had they been contacted, and that he based his opinion on the timing of Nathaniel's fatal blow on inadmissible hearsay. The superior court ruled:

> [W]ith regard to Dr. Coleman's opinions that emanate[ ] specifically from Drs. Wigren and Reynolds, that is hearsay and will not be allowed.[13]
>
> [E]xcluded will be what they would have done, CPS or the police; whether or not the child would have been removed from the parents' custody, excluded; whether Nathaniel would be alive today, because I saw that as part of the opinion as well, that is excluded.[14]
>
> [A]s to his opinion on the timing of the fatal blow and whether or not there was a skull fracture in place on the day on which Dr. Cowan saw Nathaniel, this is based on the mother, Ms. Conway's statements to the police, which are hearsay; and it is also based on the statement of the defendant on plea of guilty, also hearsay. So, I will not allow him to testify about the timing of the fatal blow, or whether or not a skull fracture was in place on the date on which Dr. Cowan saw her—him, excuse me.[15]

---

[13] Report of Proceedings (RP) (Mar. 25, 2014) at 4.

[14] Id. at 4-5.

[15] Id. at 6.

Following these rulings, Stephen and the estate conceded that "the Court's ruling that our doctor can't testify to those essential elements of proof . . . do[es] essentially take away the plaintiff's ability to prove our case."[16] Based on this concession, the superior court granted Dr. Cowan's and FHS's motion for a directed verdict.

Stephen appeals the partial summary judgment order dismissing his wrongful death and failure to report claims. He and the estate appeal the order on directed verdict.

## ANALYSIS

### *Directed Verdict*

"'Granting a motion for directed verdict is appropriate when, viewing the evidence most favorable to the nonmoving party, the court can say, as a matter of law, there is no substantial evidence or reasonable inference to sustain a verdict for the nonmoving party.'"[17] "'Substantial evidence is said to exist if it is sufficient to persuade a fair-minded, rational person of the truth of the declared premise.'"[18] This court reviews a ruling on a motion for directed verdict under the same standard as the superior court.[19] Here, the directed verdict was the direct result of the order granting the motion in limine.

The superior court is "vested with discretion to determine whether a witness is competent to testify as an expert on a particular subject and its ruling will not be

---

[16] Id. at 20.

[17] Guijosa v. Wal-Mart Stores, Inc., 144 Wn.2d 907, 915, 32 P.3d 250 (2001) (quoting Sing v. John L. Scott, Inc., 134 Wn.2d 24, 29, 948 P.2d 816 (1997)).

[18] Id. (quoting Brown v. Superior Underwriters, 30 Wn. App. 303, 306, 632 P.2d 887 (1980)).

[19] Stiley v. Block, 130 Wn.2d 486, 504, 925 P.2d 194 (1996).

disturbed except for a manifest abuse of discretion."[20] "Expert testimony is usually admitted under ER 702 if helpful to the jury's understanding of a matter outside the competence of an ordinary layperson. Medical malpractice cases are a prime example of cases where such testimony is needed."[21]

Stephen and the estate argue the superior court abused its discretion when it excluded Dr. Coleman's causation opinions relating to the postmortem pathology findings. We disagree.

In Washington, "[i]t is the scope of a witness's knowledge and not artificial classification by professional title that governs the threshold question of admissibility of expert medical testimony in a medical malpractice case."[22] "So long as a physician with a medical degree has sufficient expertise to demonstrate familiarity with the procedure or medical problem at issue, '[o]rdinarily [he or she] will be considered qualified to express an opinion on any sort of medical question, including questions in areas in which the physician is not a specialist.'"[23] However, the issue must be "of such a nature that an expert expresses an opinion based on a reasonable probability rather than mere conjecture o[r] speculation."[24]

---

[20] Young v. Key Pharm., Inc., 112 Wn.2d 216, 242, 770 P.2d 182 (1989).

[21] Reese v. Stroh, 128 Wn.2d 300, 308, 907 P.2d 282 (1995) (citations omitted).

[22] Eng v. Klein, 127 Wn. App. 171, 172, 110 P.3d 844 (2005).

[23] White v. Kent Med. Ctr., Inc., P.S., 61 Wn. App. 163, 173, 810 P.2d 4 (1991) (alterations in original) (quoting 5A KARL B. TEGLAND, WASHINGTON PRACTICE, EVIDENCE § 290[2], at 386 (3d ed. 1989)).

[24] Volk v. Demeerleer, 184 Wn. App. 389, 433, 337 P.3d 372 (2014) review granted, 183 Wn.2d 1007, 352 P.3d 188 (2015).

"Washington case law allows admission of expert opinion based on data interpreted by another when certain requirements of ER 703 are met."[25]

> First, the judge should find the underlying data are of a kind reasonably relied upon by experts in the particular field in reaching conclusions. And second, since the rule is concerned with trustworthiness of the resulting opinion, the judge should not allow the opinion if (1) the expert can show only that he customarily relies upon such material, and (2) the data are relied upon only in preparing for litigation.[26]

An expert cannot be a "mere conduit" by serving as a "surrogate" for other experts who do not testify.[27] An expert may refer to the opinions of other experts so long as "their [own] opinions and [own] conclusions were independently derived from their significant expertise and analysis that they applied to the forensic work of others."[28] "And, absent an exception to the hearsay rule, hearsay statements of the opinions of third parties are inadmissible."[29]

Here, the superior court judge expressly ruled that "with regard to Dr. Coleman's opinions *that emanate[ ] specifically from Drs. Wigren and Reynolds*, that is hearsay and will not be allowed."[30] We read this as precluding Dr. Coleman from simply

---

[25] State v. Nation, 110 Wn. App. 651, 662-63, 41 P.3d 1204 (2002).

[26] Id.

[27] See State v. Lui, 153 Wn. App. 304, 320-21, 221 P.3d 948 (2009) aff'd, 179 Wn.2d 457, 315 P.3d 493 (2014) (confrontation clause applied to the admission of expert testimony based upon opinions of nontestifying pathologists).

[28] Id. at 325.

[29] Nation, 110 Wn. App. at 662; see State v. Martinez, 78 Wn. App. 870, 880, 899 P.2d 1302 (1995) (ER 703 not designed to allow witness to summarize and reiterate all manner of inadmissible evidence).

[30] RP (Mar. 25, 2014) at 4 (emphasis added).

parroting the opinions of those two pathologists. In consulting with Dr. Coleman, Drs. Wigren and Reynolds provided their opinions about the timing of the macrophage and hemosiderin deposits in the brain.[31] Based on those opinions, Dr. Coleman generally offered testimony that "had the investigation [by Dr. Cowan and FHS] been done, they would have discovered abnormalities such [that] the child would have been kept, would have been hospitalized, would have been treated, and would have lived."[32] But in his deposition, Dr. Coleman admitted that the pathology issues were beyond his area of expertise,[33] that he did not know whether the bruising of Nathaniel's eye was the result of blunt force trauma,[34] that he had "no idea" what the physical mechanism of

---

[31] Hemosiderin is an iron-storage complex. It is only found within cells (as opposed to circulating in blood). Hemosiderin is most commonly found in macrophages (white blood cells) and is especially abundant in situations following hemorrhage (bleeding). NEWS MEDICAL, http://www.news-medical.net/health/What-is-a-Macrophage.aspx (last visited Oct. 9, 2015); MDDK, http://mddk.com/hemosiderin.html (last visited Oct. 9, 2015).

[32] CP at 2447.

[33] Dr. Coleman testified:

> Q. And the pathology issues, I take it, were beyond your area of expertise.
>
> A. That's right. *That's why I had to become familiar with it.*

Id. at 2424 (emphasis added).

[34] Dr. Coleman testified:

> Q. [D]o you believe that bruising was the result of physical blunt-force trauma by Domenique Conway sometime prior to the visit, to a degree of reasonable medical probability?
>
> A. . . . I think it is more likely than not direct trauma, *but I don't think I know for sure. It's more likely than not one or the other.*

Id. at 2438 (emphasis added).

10

injury was that inflicted the bruising,[35] and that nothing in the pathology results revealed whether the skull fracture occurred before or after the March 7 emergency room visit.[36]

On this record, it was not an abuse of discretion to conclude Dr. Coleman lacked sufficient expertise to form his own independent opinion on the pathology issues involved in the case. Therefore, if permitted to testify at trial, Dr. Coleman would have merely recounted the opinions of Drs. Wigren and Reynolds rather than express his own interpretation of the autopsy results. In this setting, the order precluding any reference to the opinions of Drs. Wigren and Reynolds was within the discretion of the superior court.

---

[35] Dr. Coleman testified:

> Q. Okay. Can you tell us what would be the physical mechanism of injury if it is blunt trauma? How did the mother strike this child that resulted in that bruising on the eyelid but not bruising elsewhere?
>
> A. Well I have no idea. . . .There's no—I have no idea how it would have been inflicted, but it's certainly possible to be inflicted.

Id. at 2438 (emphasis added).

[36] Dr. Coleman testified:

> Q. Based upon the pathology, is it possible that this child's skull fracture occurred sometime subsequent to the emergency department visit on the evening of March 7th, in your opinion?
>
> A. Based upon the autopsy, my consultations with the pathologists, and my review of the literature, *I think that it is possible that this happened at any—it's an acute fracture.*
>
> . . . .
>
> Q. . . . *So based upon what you know as a physician sitting here and what you've communicated with the pathology folks that you've talked to, that skull fracture could have taken place before the evening of March 7 or after the evening of March 7.*
>
> A. *It's possible.*

Id. at 2440 (emphasis added).

Stephen and the estate also argue that the superior court erred when it excluded Dr. Coleman's testimony concerning what CPS or law enforcement would have done had Dr. Cowan or FHS contacted them, including whether Nathaniel would have been removed from his parents and whether he would be alive today. But these limitations are consistent with Dr. Coleman's deposition testimony that he did not know CPS policies and did not have any experience with how CPS dealt with reports of abuse.[37] Nor did Dr. Coleman establish a foundation that he could predict whether Nathaniel would be alive today had CPS or law enforcement been contacted. During his deposition, Dr. Coleman testified that he had "no way to know" whether Nathaniel would have ultimately gone home to his parents had CPS become involved, and furthermore, that he did not know whether Nathaniel would have been abused more or killed at a later date had he been returned home.[38]

Dr. Coleman failed to demonstrate to a reasonable probability that CPS or the police would have intervened had they been contacted. Moreover, Dr. Coleman's

---

[37] Dr. Coleman testified:

> Q. If CPS is called by an emergency physician, how long do they have to . . . initiate or complete their evaluation or investigation?
>
> A. That I don't know. I'm not a CPS expert.
>
> . . . .
>
> Q. . . . So there will be times, will there not, where an investigation for potential child abuse is occurring and the child remains with his or her parent?
>
> A. I'm quite sure that is the case. Again, I'm not a CPS expert.

Id. at 2435.

[38] Id. at 2447.

testimony did not establish beyond conjecture or speculation that more likely than not, had they intervened, Nathaniel would be alive today. We conclude the superior court did not abuse its discretion when it excluded this causation testimony.[39]

Stephen's and the estate's final argument regarding the superior court's ruling on the motion in limine is that the court erred when it excluded Dr. Coleman's opinion on the timing of Nathaniel's fatal blow. We find their argument unpersuasive.

While ER 703 "permits an expert witness to take into account matters which are unadmitted and inadmissible, it does not follow that such a witness may simply report such matters to the trier of fact: The Rule was not designed to enable a witness to summarize and reiterate all manner of inadmissible evidence."[40] Moreover, "'courts have been reluctant to allow the use of ER 705 as a mechanism for admitting otherwise inadmissible evidence as an explanation of the expert's opinion.'"[41]

Here, during his deposition, Dr. Coleman admitted that "the science of this doesn't tell us the skull fracture happened at this point instead of that point."[42] He further testified:

---

[39] We do not read the superior court's order as precluding Dr. Coleman from testifying that *if* the skull fracture existed at the time of the March 7 visit and *if* it had been discovered, it could have been successfully treated.

[40] Martinez, 78 Wn. App. at 880 (quoting 3 DAVID LOUISELL & C. MUELLER, FEDERAL EVIDENCE § 389, at 663 (1979)).

[41] Id. at 879 (quoting State v. Anderson, 44 Wn. App. 644, 652, 723 P.2d 464 (1986)). Under ER 705, "[t]he expert may testify in terms of opinion or inference and give reasons therefor without prior disclosure of the underlying facts or data, unless the judge requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross examination."

[42] CP at 2440.

Q. When do you believe the strike occurred that caused the skull fracture?

A. I have no way of knowing with certainty. If the mother's history subsequently taken is to be believed, then it occurred on March 5th.[43]

Dr. Coleman's deposition testimony confirms that he merely concluded it was possible the skull fracture existed before the March 7 visit and possible it did not occur until after the March 7 visit. His only more probable than not opinion is based upon his acceptance of Domenique's statement to the prosecutor and the statement on the plea of guilty that "[o]n about March 5[,]" she hit Nathaniel twice in the side of his head.[44] Thus, if permitted to testify at trial, Dr. Coleman would have testified to Domenique's statements of fact on the timing of the fatal blow rather than to his independently derived expert opinion.

While it is well settled that an expert can formulate and express an opinion based in part upon hearsay testimony, an expert cannot merely recite that a person said she hit another on a specific day and therefore form an expert opinion that it is more probable than not she did hit that person on that day.[45] Here, it was within the discretion of the superior court to conclude that, based upon his deposition testimony, Dr. Coleman had not formed an admissible opinion on the timing of the fatal blow.

Therefore, it was not an abuse of discretion to impose the three specific limitations upon the testimony of Dr. Coleman. The superior court did not bar all causation testimony by Dr. Coleman.

---

[43] Id. at 2439.

[44] Id. at 1069.

[45] See ER 703, 705.

In turn, Stephen and the estate's counsel expressly acknowledged that "the Court's ruling that our doctor can't testify to those essential elements of proof . . . do[es] essentially take away the plaintiff's ability to prove our case."[46] Therefore, we conclude it was not error to grant the directed verdict.

### Partial Summary Judgment Order

This court reviews an order granting summary judgment de novo.[47] Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.[48] "A defendant in a civil action is entitled to summary judgment when that party shows that there is an absence of evidence supporting an element essential to the plaintiff's claim."[49]

Stephen argues the superior court erred when it determined he did not have a claim for the loss of parental consortium and the parent-child relationship pursuant to RCW 4.24.010. Because Stephen relied on Dr. Coleman's testimony to establish proximate cause for this claim, we find no merit in his argument.

RCW 4.24.010 gives parents a direct action for the death of a minor child.[50] But a claim under the statute requires proof of the cause of the wrongful death.[51] We reject

---

[46] RP (Mar. 25, 2014) at 20.

[47] Jones v. Allstate Ins. Co., 146 Wn.2d 291, 300, 45 P.3d 1068 (2002).

[48] CR 56(c).

[49] Las v. Yellow Front Stores, Inc., 66 Wn. App. 196, 198, 831 P.2d 744 (1992).

[50] Upchurch v. Hubbard, 29 Wn.2d 559, 563-64, 188 P.2d 82 (1947) (citing REM. REV. STAT. § 184 (1869), recodified as RCW 4.24.010).

[51] Deffland v. Spokane Portland Cement Co., 26 Wn.2d 891, 913, 176 P.2d 311 (1947) (negligence of defendant must be shown to support recovery under this section).

any suggestion that the only causation required is the fact of death. The death must be related to the conduct that forms the basis for the claim.[52]

As raised in the reply by FHS on summary judgment, the declaration of Dr. Coleman contains only general conclusory statements as to proximate cause. In his declaration, Dr. Coleman merely stated that, had the standard of care been met, "the following would have occurred on March 7:

> (a) The skull fracture discussed in the autopsy report would have been discovered had the required x-rays been done;

> (b) A CT of the head would have been done;

> (c) Intracranial injuries and hemorrhage(s) would have been discovered;

> (d) The infant would have been hospitalized and appropriately treated;

> (e) CPS would have been immediately summoned; and

> (f) The infant would have been appropriately treated and would have survived.[53]

Absent a foundation that the skull fracture and intracranial injuries occurred prior to March 7, these vague statements are inadequate to defeat summary judgment.

Here, the superior court expressly granted summary judgment dismissing Stephen's RCW 4.24.010 claim for lack of proximate cause. We conclude Dr. Coleman's declaration was inadequate to create genuine issues of material fact regarding causation. Additionally, the superior court's ruling is consistent with its ultimate rulings on Dr. Coleman's testimony regarding causation.

---

[52] Id.

[53] CP at 1165.

Lastly, Stephen argues the superior court erred when it determined that Dr. Cowan lacked a "subjective suspicion of abuse" in dismissing Stephen's failure to report child abuse claim.[54]

RCW 26.44.030(1)(a) provides that

[w]hen any practitioner, county coroner or medical examiner, law enforcement officer, professional school personnel, registered or licensed nurse . . . *has reasonable cause to believe that a child has suffered abuse or neglect*, he or she shall report such incident, or cause a report to be made, to the proper law enforcement agency or to the department as provided in RCW 26.44.040.[55]

While there is an implied cause of action pursuant to RCW 26.44.030 against a mandatory reporter who fails to report suspected child abuse, there is also a causation requirement.[56]

We need not address the superior court's statement about the lack of a "subjective suspicion of abuse."[57] The duty to report is only triggered by "reasonable cause" to believe a child has suffered abuse or neglect.[58] In 2013, the legislature adopted a "clarifying" definition of "reasonable cause."[59] "'Reasonable cause' means a person *witnesses or receives a credible written or oral report alleging abuse*, including

---

[54] Appellant's Br. at 39.

[55] (Emphasis added.)

[56] Beggs v. State, Dep't of Soc. & Health Servs., 171 Wn.2d 69, 77-78, 247 P.3d 421 (2011).

[57] CP at 1736.

[58] RCW 26.44.030(1)(a).

[59] The digest for Senate Bill 5359 provides that the revision "[c]larifies the meaning of certain terms for the purposes of mandatory reporting requirements of child abuse and neglect." 1 LEGISLATIVE DIGEST AND HISTORY OF BILLS, 63rd Leg., at 102 (2d ed. 2013-14).

sexual contact, or neglect of a child."[60] When the legislature clarifies a term, especially one that has not been previously defined, retroactive application of that clarification is appropriate.[61]

Here, there was no external indicia of injury on March 7 other than a bruise of Nathaniel's upper left eyelid and eyebrow that was inconsistent with a blow to the eye and consistent with Domenique's explanation that another one of her children may have thrown a toy into Nathaniel's crib. Especially because there was no evidence that a skull fracture existed at the time of the March 7 emergency room visit, there was no showing of reasonable cause compelling a report of child abuse. We conclude there was no genuine issue of material fact to support a failure to report child abuse claim. Accordingly, the superior court properly dismissed Stephen's statutory claims.

We affirm.

WE CONCUR:

---

[60] RCW 26.44.030(1)(b)(iii) (emphasis added).

[61] McGee Guest Home, Inc. v. Dep't of Soc. & Health Servs. of State of Wash., 142 Wn.2d 316, 324, 12 P.3d 144 (2000).