IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| REBECCA CURLEY, | ) | No. 78250-9-I |
| | ) | |
| Appellant, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| SKAGIT VALLEY HOSPITAL (Public | ) | |
| Hospital District No. 1 d/b/a SKAGIT | ) | |
| REGIONAL HEALTH); and DR. ROGER | ) | |
| P. ESTEP, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | FILED: July 22, 2019 |

ANDRUS, J. — Rebecca Curley appeals the dismissal of her negligence claims against Dr. Roger Estep and Skagit Valley Hospital arising out of the care she received in the triage unit of the hospital's Family Birth Center. The experience, resulting in the stillbirth of her child, was clearly traumatic for Rebecca and her husband, Thomas[1]. But Rebecca did not allege Dr. Estep or the hospital caused the fetal demise. She instead alleged that the care she received exacerbated her pre-existing post-traumatic stress disorder (PTSD). Because Rebecca did not present competent expert testimony to establish the standard of care, breach, or causation, we affirm the dismissal of her claims.

---

[1] We refer to the Curleys by their first names for clarity only. We mean no disrespect in doing so.

FACTS

On May 1, 2015, Rebecca, then 21 weeks into her fourth pregnancy, called the University of Washington Medical Center (UWMC) to report symptoms of abdominal pains and vomiting. UWMC had previously diagnosed Rebecca with suspected "invasive placentation,"[2] and had advised her that this condition could cause life-threatening bleeding and would require a Cesarean section delivery and hysterectomy. UWMC instructed Rebecca to seek an evaluation, either from UWMC Seattle or a hospital closer to her home. Rebecca testified UWMC told her she needed an ultrasound and would have to be airlifted to that facility if she went into labor because she was at risk of hemorrhaging. Rebecca and Thomas drove to Skagit Valley Hospital for this evaluation.

The Curleys arrived at Skagit Valley at 2:45 p.m. Per hospital policy, all pregnant women over 20 weeks' gestation are triaged in the Family Birth Center, the hospital's maternity ward, so Rebecca was attended to by the triage nurse, Tori Jackson. Because Rebecca did not have a provider at Skagit Valley, Jackson used a computerized system to assign a physician, Dr. Estep, from the unassigned on-call rotation list.

During the initial intake, Rebecca reported she was not in pain, bleeding, or in active labor. Jackson triaged Rebecca as in need of "urgent" care, the mid-level triage classification at Skagit Valley. Under this classification, the patient "will not

---

[2] Invasive placentation occurs when the placenta is attached too strongly or grows into the uterine wall. It can be a life-threatening condition as it can cause significant blood loss during childbirth. It requires delivery via Cesarean section and sometimes involves a hysterectomy (removing the uterus). See https://www.swedish.org/services/maternal-and-fetal-specialty-care/pregnancy-complications/complications-of-the-placenta.

deteriorate with slight delay in care," and the nurse must notify a physician once she has completed her assessment.

By 3:10 p.m., Jackson had determined, using a fetal monitor and then a Doppler,[3] that there was no fetal heartbeat. Jackson testified, and her medical notes indicated, that at her request, another nurse, Holly Braaten, checked and was also unable to locate a fetal heartbeat. Rebecca testified she and her husband demanded that the hospital perform an ultrasound.

Jackson contacted Dr. Estep, who was seeing patients at a clinic and not present at the hospital. Dr. Estep made a telephonic order for an ultrasound at 3:40 p.m. to determine fetal viability. Skagit Valley diagnostic medical sonographer[4] Carrie Chambliss completed the ultrasound at 4:12 p.m. Chambliss, like Jackson and Braaten, was unable to detect a heartbeat. Chambliss informed Jackson of the ultrasound results via telephone at 4:20 p.m., which Jackson conveyed to Rebecca and Thomas. When Jackson notified Dr. Estep, he asked Jackson to confirm through a vaginal examination that Rebecca was not in active labor.

Dr. Estep testified that once he knew Rebecca was not in labor, he left a message for Rebecca's perinatologist at UWMC to discuss a care plan for her. He intended to travel to Skagit Valley to discuss the plan with her once he discussed it with her provider.

---

[3] A Doppler is a handheld fetal heart rate monitor. See https://www.fda.gov/Radiation-EmittingProducts/RadiationEmittingProductsandProcedures/MedicalImaging/ucm115357.htm.

[4] A diagnostic medical sonographer is specially trained to perform ultrasounds and other diagnostic imaging mechanisms and is required to pass national board examinations.

Rebecca testified that by this time, she began to panic, thinking that her life could be in danger. She felt that no one was communicating with her and Thomas about what could be done or what they needed to do. She felt the triage room walls begin to close in on her. At that point, the Curleys decided they needed to leave the hospital and drive to UWMC in Seattle.

Jackson called Dr. Estep at 4:40 p.m. to alert him that Rebecca was anxious to leave Skagit Valley to receive treatment at UWMC Seattle. Jackson testified that she explained to Rebecca that Dr. Estep was awaiting further instruction from UWMC and that it was not advisable to leave Skagit Valley by private car.

At 5:00 p.m., the formal ultrasound report came back in which radiologist Dr. Scott Harrison confirmed fetal demise. At 5:04 p.m., Thomas informed Jackson they were leaving. Rebecca signed a "Leaving Hospital Against Medical Advice" form. Her stay at Skagit Valley was approximately 2 hours and 11 minutes.

UWMC Seattle admitted Rebecca at 7:58 p.m. that evening. Her UWMC records note that she arrived in good condition; she was not bleeding or experiencing any cramping or contractions. Four days later, Rebecca underwent a hysterectomy.

Rebecca filed a lawsuit against Dr. Estep and Skagit Valley, alleging medical malpractice under chapter 7.70 RCW. She also alleged claims of loss of consortium, outrage, intentional infliction of emotional distress, and negligent infliction of emotional distress.

On November 9, 2017, the trial court dismissed Rebecca's claims of negligent infliction of emotional distress and outrage but granted a CR 56(f) continuance as to Rebecca's medical negligence claims.

- 4 -

After completing further discovery, Rebecca submitted supplemental documents in opposition to the summary judgment motions, including an expert report of forensic psychiatrist Dr. Shobhit Negi, and a report from Dr. Frederick Gonzalez, a board-certified obstetrician-gynecologist from New York. Dr. Estep and Skagit Valley challenged the sufficiency of these reports to establish the standard of care, breach, and causation.

During the hearing, Rebecca confirmed she did not blame either Dr. Estep or the hospital for the loss of her child; she claimed instead that their treatment worsened her pre-existing PTSD. Rebecca identified two breaches of the standard of care: (1) Dr. Estep's failure to personally evaluate Rebecca before the hospital staff confirmed fetal demise; and (2) Skagit Valley's failure to provide an obstetrician-gynecologist, rather than a family medicine practitioner, to evaluate her.

The trial court granted summary judgment and dismissed Rebecca's malpractice claims. Rebecca appeals.[5]

## ANALYSIS

We review an order granting summary judgment de novo, engaging in the same inquiry as the trial court. Volk v. DeMeerleer, 187 Wn.2d 241, 254, 386 P.3d 254 (2016). Summary judgment is proper when the pleadings, affidavits, depositions, and admissions demonstrate there is no genuine issue of material fact. Berger v. Sonneland, 144 Wn.2d 91, 102, 26 P.3d 257 (2001).

---

[5] Rebecca does not appeal the dismissal of the negligent infliction of emotional distress or the outrage claims.

When an alleged injury results from healthcare, chapter 7.70 RCW governs. 144 Wn.2d at 109. RCW 7.70.030 states in relevant part:

> No award shall be made in any action or arbitration for damages for injury occurring as the result of health care . . . unless the plaintiff establishes one or more of the following propositions:
>
> (1) That injury resulted from the failure of a health care provider to follow the accepted standard of care;
>
> . . . .
>
> Unless otherwise provided in this chapter, the plaintiff shall have the burden of proving each fact essential to an award by a preponderance of the evidence.

Moreover, RCW 7.70.040 provides:

> The following shall be necessary elements of proof that injury resulted from the failure of the health care provider to follow the accepted standard of care:
>
> (1) The health care provider[6] failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider at that time in the profession or class to which he or she belongs, in the state of Washington, acting in the same or similar circumstances;
>
> (2) Such failure was a proximate cause of the injury complained of.

Rebecca argues that the trial court erroneously dismissed her claims on summary judgment because the declarations of Dr. Gonzalez and Dr. Negi create genuine issues of material fact as to the applicable standard of care, breach, and causation. We disagree.

In medical malpractice cases, an expert must "establish the applicable standard and how the defendant acted negligently by breaching that standard."

---

[6] RCW 7.70.020 defines "health care provider" as: "(1) A person licensed by this state to provide health care or related services including . . . a physician . . . [and] nurse. . . . [or] (3) An entity, whether or not incorporated, facility, or institution employing one or more persons described in part (1) above, including . . . a hospital."

Reyes v. Yakima Health Dist., 191 Wn.2d 79, 86-87, 419 P.3d 819 (2018).

Without this evidence, an expert's testimony will not establish a genuine issue of fact. Id. at 89.

### 1. Dr. Gonzalez's testimony

Rebecca presented the declaration of Dr. Gonzalez to establish the standard of care. Dr. Gonzalez testified:

> On 5/1/15 [Rebecca] went to Skagit Valley Hospital, at 19 5/7 wks, with the complaint of pain and tenderness for a few days. She stated the fetus was moving. She was never seen by a physician even though she was a high risk pregnancy. She was evaluated and the nurses in attendance did not find a fetal heart rate. They communicated this to the covering physician who ordered an ultrasound. It took an hour to perform the ultrasound. The ultrasound technician confirmed the diagnosis of an intrauterine fetal demise. Her finding was never corroborated by a second observer or by a physician. It is standard procedure to have the diagnosis of an intrauterine fetal demise to be corroborated by a second observer [or] by a physician.

> She was never evaluated by a physician and there is no way of knowing if there was a fetal demise during the hour prior to having the ultrasound performed. Failure to evaluate the patient with an intrauterine fetal demise with pain and tenderness by a physician represents a departure from good and accepted medical care. The delay in obtaining the ultrasound was a departure from good and accepted medical care.

> In addition, the physician that was called, Dr. Estep was a family practitioner. Reviewing his qualifications on his delineation of privileges, he did not have the training or the expertise to manage the potential complications of a hysterotomy or hysterectomy which was potentially present with Mrs. Curley's condition. The nurses, nurse Jackson, and Dr. Estep should have called a physician qualified and able to handle the potential complications of bleeding, hysterotomy, and hysterectomy. That should have been an obstetrician-gynecologist. That was not done.

> . . .

> Failure to evaluate the patient by a physician at the original hospital represents a departure from good and accepted medical care. Standard of care required an immediate evaluation in a high risk

pregnancy that was complicated by abdominal pain and the inability of the nurses to find a fetal heart rate. Failure to properly evaluate the ultrasound diagnosis of a fetal demise by a second observer or a physician is a departure from good medical care. Failure to call an appropriately qualified physician that could have managed the potential complications of Mrs. Curley is also a departure from good and accepted medical care.

The duty of the physicians was to immediately evaluate the condition of the mother and the fetus, confirm that she was hemodynamically stable, confirmed that there was no coagulopathy, and planned for the safe evacuation of the uterus.

There are two major problems with Dr. Gonzalez's testimony. First, Dr. Gonzalez did not indicate that Dr. Estep or Skagit Valley failed to exercise the "degree of care, skill, and learning expected of a reasonably prudent health care provider . . . in the state of Washington, acting in the same or similar circumstances" as required by RCW 7.70.040. Instead, Dr. Gonzalez's opinion was that their care did not meet "good and accepted medical care," which is not the legal standard in Washington.

Second, there was no indication that Dr. Gonzalez was familiar with the standard of care in Washington. According to Dr. Gonzalez's curriculum vitae, he is a board-certified obstetrician-gynecologist, and at the time was licensed in New York and Utah. His credentials did not indicate that he had ever been licensed to or practiced medicine in Washington state.

Rebecca argues that an expert may base his opinions on a national standard of care, citing to Elber v. Larson, 142 Wn. App. 243, 173 P.3d 990 (2007). But in Elber, the expert testified that the standard for neurosurgeons is a national standard. Id. at 247. The Elber court permitted the expert to testify because the standard of care for neurosurgeons did not differ among states. Id. at 247-48.

Rebecca also relies on Eng v. Klein, 127 Wn. App. 171, 179, 110 P.3d 844 (2005), in which the expert's testimony was deemed admissible because he testified that his opinion was based on "what would be [the] national standards of care for diagnosing and treating meningitis." Id. at 179. Here, Dr. Gonzalez did not indicate that the standard of care for treating a woman diagnosed with suspected invasive placentation is the same nationwide.

Conversely, Skagit Valley and Dr. Estep presented testimony from two experts that the standard of care in Washington does not require an immediate physical evaluation by an obstetrician-gynecologist. Skagit Valley presented the expert opinion of Dr. Robert Olson, a board-certified obstetrician-gynecologist practicing in Bellingham, Washington for over 30 years. Dr. Olson testified that he was "familiar with the standard of skill, care, and learning expected of the physicians and the hospital staff, including nurses, who provided care" for Rebecca. Dr. Olson opined that it is common for patients who arrive at a hospital for an unscheduled visit to be evaluated by a registered nurse in triage and for that nurse to then telephone a physician with her findings and to receive further instructions. Dr. Olson further testified that it is within the standard of care for the physician to initially evaluate the patient's needs by phone and that the standard of care did not require Dr. Estep to see Rebecca in person at that time because there was no objective evidence that Rebecca's condition was worsening. He noted that Rebecca had stable vital signs, no vaginal bleeding, no ruptured membranes, no preterm labor and no evidence of any complications.

Dr. Estep presented the expert opinions of Dr. Nancy O'Neil, also a board-certified obstetrician-gynecologist in Washington. Dr. O'Neil testified that she was

"familiar with the standard of care regarding assessing obstetrical patients who present to the hospital for triage in the State of Washington as it existed in May 2015." She stated that Dr. Estep met the standard of care of a reasonably prudent obstetric provider and that the standard did not require him to come into the hospital to personally evaluate Rebecca under the circumstances of this case.

Dr. Gonzalez's declaration and report fail to contradict the standard of care opinions of either Dr. Olson or Dr. O'Neil because he did not indicate a familiarity with the applicable standard of care in Washington state as required by statute or "state specific facts showing what the applicable standard of care was and how the defendant violated it" as required by Reyes. 191 Wn.2d at 89. We agree with the trial court's conclusion that Dr. Gonzalez's report failed to meet this statutory requirement.

Rebecca argues that even if Dr. Gonzalez's report did not set out the applicable standard of care, Skagit Valley's alleged non-compliance with its own triage policies established an issue of fact on the element of breach of the standard of care. Rebecca contends that Skagit Valley breached the hospital's triage policies by classifying her as "urgent," the mid-level triage classification, rather than "emergent," the highest triage classification, and by failing to have her promptly examined by a physician. Although it is certainly arguable that a hospital's triage policies might establish some standard of care, Dr. Gonzalez did not so testify. Nor did Dr. Gonzalez opine that Skagit Valley or its nursing staff breached any specific triage policy.

Finally, even if we were to accept Dr. Gonzalez's opinions regarding the standard of care, he did not link any alleged breach with Rebecca's exacerbated

PTSD. Although Dr. Gonzalez testified that the fetus may have been alive when Rebecca arrived at Skagit Valley, Rebecca conceded that there was nothing Dr. Estep or the hospital could have done to save her baby. Moreover, Rebecca did not experience any complications either while at Skagit Valley or after she was admitted into UWMC. The risks of which Dr. Gonzalez expressed concern simply did not happen here.

2. Dr. Negi's testimony

Rebecca concedes that Dr. Gonzalez did not causally link her medical treatment at Skagit Valley with her PTSD. She instead relies on the testimony of Dr. Negi, a board-certified forensic psychiatrist, to establish causation. Dr. Negi testified that Rebecca's fear began around April 20, 2015, when she was diagnosed with placenta accrete, a condition "associated with high mortality." Dr. Negi opined that Rebecca "sustained significant emotional harm due to the quality of care she received at Skagit Valley Hospital on May 1, 2015." He reported that while at the hospital, Rebecca feared for her life. He stated this fear was due to a combination of factors, including having a dead fetus inside her uterus and not receiving clear communications from the staff as to the next steps in managing her condition.

Dr. Negi reported that since losing her fetus in May 2015, Rebecca had been anxious and depressed, fearful of leaving her house, afraid she or her children might be taken to Skagit Valley Hospital if ill or injured, and experiencing frequent nightmares and feelings of guilt for not going to a different hospital.

We do not doubt, given the trauma of losing a child, that Rebecca has undergone the psychiatric symptoms she described to Dr. Negi. But Dr. Negi's

opinions fail to link Rebecca's emotional condition to any specific breach of the standard of care by Dr. Estep or Skagit Valley. Rebecca conceded that Dr. Estep was unaware of her pre-existing PTSD. Although Rebecca argued Skagit Valley should have known of this condition, she presented no testimony from Dr. Negi as to what steps the hospital should have taken to prevent her from sustaining this psychiatric injury. The only two alleged breaches of the standard of care—the failure of a physician to personally evaluate her in the two hours she was at Skagit Valley and the failure of Skagit Valley to call in a qualified obstetrician-gynecologist to attend to her personally—have nothing to do with managing Rebecca's psychiatric condition. Dr. Negi did not testify that but for these particular breaches in the standard of care, Rebecca would not have experienced the anxiety, depression, and nightmares she has had.

Because Rebecca failed to present expert testimony from a physician familiar with the standard of care in Washington to establish how the standard of care was breached and failed to causally connect the alleged breaches to her psychiatric condition, the trial court correctly granted summary judgment.[7]

Affirmed.

WE CONCUR:

_Andrus, J._

_Smith, J._

_Verellen, J._

---

[7] Because Rebecca has failed to establish a breach and causation, we reject her contention that Skagit Valley is also liable under a corporate negligence theory. See Douglas v. Freeman, 117 Wn.2d 242, 248, 814 P.2d 1160 (1991) (in order to prevail on a corporate negligence claim, the plaintiff must prove the requisite elements of negligence: duty, breach, and proximate cause).

- 12 -